930 F.2d 277
 1991 Copr.L.Dec. P 26,717, 19 Fed.R.Serv.3d 907,
RICO Bus.Disp.Guide 7731, 18 U.S.P.Q.2d 1417
 FORD MOTOR COMPANY, Appellant and Cross-Appellee,
v.
SUMMIT MOTOR PRODUCTS, INC., a corporation; Alto Products
Corporation, a corporation; Sanford Landa, an individual;
Dorothy Landa, an individual; Tension Envelope Corporation;
a corporation; Altran Corporation, a corporation; and
Acme Corporation, Inc., a corporation
Altran Corporation, Appellee and Cross-Appellant.
 Nos. 90-5225, 90-5256, 90-5348 and 90-5363.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 10, 1991.
Decided April 8, 1991.
Rehearing and Rehearing In Banc
Denied May 13, 1991.
 
 William J. Heller, Hannoch Weisman, Roseland, N.J., David C. Hilliard (argued), Charles R. Mandly, Jr., Diane G. Elder, Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Chicago, Ill., for plaintiff-appellant-cross-appellee, Ford Motor Co.
 Jonathan M. Hyman, Newark, N.J., David L. Harris (argued), Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for defendant-appellee-cross-appellant, Altran Corp.
 Before COWEN, ALITO and GARTH, Circuit Judges.
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 Before us are four appeals arising out of an action initiated by Ford Motor Company ("Ford") against, inter alia, Altran Corporation ("Altran"), alleging copyright, trademark, and unfair competition violations, and an ensuing counterclaim filed by Altran against Ford for racketeering. Prior to trial, the district court dismissed Altran's counterclaim and denied a motion by Ford for Rule 11 sanctions, and thereafter, the jury returned a verdict for Altran on every Ford claim. Ford's motion for a new trial was subsequently denied. Altran has appealed the dismissal of its counterclaim, while Ford has appealed the district court's denial of its new trial motion and its Rule 11 motion. We find that the district court properly dismissed both Altran's claim against Ford and the related Rule 11 motion. However, we hold that the district court did not soundly exercise its discretion in denying Ford's motion for a new trial, and we will therefore vacate that order and instruct the district court to grant Ford a new trial on all of its claims.
 
 I.
 
 2
 This case has its genesis in Ford's entry into the lucrative automobile repair and replacement parts market in the late 1950s. After unsatisfactory initial efforts to merchandise repair parts, Ford began to explore other marketing options. Believing that a good tradename was one key which might unlock the door to the repair parts market, Ford commenced negotiations with the Electric Autolite Company. Electric Autolite, a primary supplier of parts for Chrysler, was a major manufacturer of automobile repair parts. In 1961, an agreement was reached pursuant to which Ford purchased from Electric Autolite the "Autolite" tradename, an Ohio spark plug factory, a Michigan battery facility, limited distribution rights, and the services of several employees.
 
 
 3
 Within the year, the United States Justice Department brought suit under section 7 of the Clayton Antitrust Act, 15 U.S.C. Sec. 18, seeking to divest Ford of the assets it acquired from Electric Autolite. Throughout the lawsuit, Ford used the "Autolite" tradename, along with the other acquisitions. In 1966, Ford created a design which it anticipated would be used with the "Autolite" name. That design consisted of a blurred image of a 1964 Ford Mustang GT (the "Ghosted GT").
 
 
 4
 Ford was found liable for Clayton Act violations by a Michigan district court (the "divestiture court") in 1968. United States v. Ford Motor Company, 286 F.Supp. 407 (E.D.Mich.1968). A final judgment was entered in 1970, which ordered Ford to divest itself of the Autolite assets, including the "Autolite" name. United States v. Ford Motor Co., 315 F.Supp. 372 (E.D.Mich.1970), aff'd, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972). After the finding of liability but before final judgment, Ford added the Ghosted GT to the "Autolite" name, and began to advertise the two together.
 
 
 5
 Pursuant to the divestiture order, Ford transferred the Autolite assets to the Bendix Corporation in 1973. Even after divestiture, Ford retained the Ghosted GT, using it in conjunction with the tradename "Motorcraft," which Ford had adopted to replace the divested "Autolite" name. In effect, Ford used the Ghosted GT to bridge the "Autolite" and "Motorcraft" names, apparently hoping that the good will associated with the "Autolite" name would travel to the "Motorcraft" name via the Ghosted GT. Ford's use of the Ghosted GT has continued to date.
 
 
 6
 In the early 1980s, Ford began to focus on the problems of counterfeit automotive parts and simulated packaging, problems which had become the subject of considerable national attention. See, e.g., Senate Comm. on the Judiciary, The Trademark Counterfeiting Act of 1984, S.Rep. No. 526, 98th Cong.2d Sess. 4 (1984), reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3627 et seq.; Ford Motor Co. v. B & H Supply, Inc., 646 F.Supp. 975, 982 (D.Minn.1986). To address the problem, Ford began vigorously to enforce its copyright and trademark rights by filing lawsuits against alleged counterfeiters, including Altran. These efforts were largely successful, as Ford obtained relief against at least forty companies engaged in counterfeiting activities.
 
 
 7
 Ford, however, was unsuccessful in the present case. In 1984, Ford filed an action against Altran in the New Jersey district court, alleging that Altran infringed Ford's copyright and trademark rights. Two separate allegations of wrongdoing form the core of Ford's claims against Altran. First, Ford claims that Altran obtained transmission kits packaged in trade dress closely resembling the Ghosted GT from Transgo, a California automobile parts manufacturer, and that Altran sold those transmission kits in that same packaging. Second, Ford contends that Altran supplied Summit Motor Products, Inc., with plastic bags bearing trade dress almost identical to the Ghosted GT, and that Summit subsequently used the bags to package and sell automobile parts.
 
 
 8
 Altran moved to dismiss the case, alleging that the 1970 divestiture order had divested Ford of the Ghosted GT. That motion was subsequently denied without prejudice, but now forms the basis for Altran's counterclaim. Specifically, Altran argues that the 1970 order divested Ford of the Ghosted GT, that Ford committed wire and mail fraud after the divestiture order by concealing its retention and use of the Ghosted GT, and that Ford's actions violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Secs. 1961-68 ("RICO").
 
 
 9
 Upon Ford's motion, the district court dismissed Altran's counterclaim in October, 1988.[1] It also denied an additional Ford motion for imposition of Rule 11 sanctions against Altran for pursuing its counterclaim. Meanwhile, Ford's copyright and trademark claims progressed to trial in January, 1990. After a trial which spanned eleven days, the jury returned a verdict against Ford on all of its claims. A special verdict form adopted by the district court revealed that the jury found no infringement by Altran on either the copyright or trademark claims.
 
 
 10
 On February 22, 1990, Ford filed a motion for a new trial under Fed.R.Civ.P. 59. That motion was denied on March 27, 1990. Prior to the district court's disposition of the motion, both Altran and Ford filed appeals at Nos. 90-5225 and 90-5256. After disposition of the motion, Altran and Ford again filed appeals at Nos. 90-5348 and 90-5363. All four appeals are now before us.
 
 II.
 
 11
 The district court's jurisdiction is not in dispute.[2] However, we must examine our appellate jurisdiction, since both parties allege that several of the appeals are jurisdictionally defective. Specifically, Altran argues that the appeals filed before the district court decided Ford's new trial motion are valid, while the appeals filed after the disposition of the motion are barred. Ford contends the opposite.[3]
 
 
 12
 Our choice between these two views hinges on the validity of Ford's Rule 59 motion. If Ford's motion for a new trial was proper, two propositions follow. First, we would not have jurisdiction over the set of appeals filed prior to the district court's disposition of the motion, since any notice of appeal filed during the pendency of a Rule 59 motion is "of no effect" and a new notice of appeal must be filed following the order disposing of the motion. Fed.R.App.P. 4(a)(4); In re Sharon Steel Corp., 918 F.2d 434, 437 (3d Cir.1990) ("Rule 4(a)(4) prohibits the filing of an appeal until the [Rule 59] motion is resolved."); Mondrow v. Fountain House, 867 F.2d 798, 799 (3d Cir.1989) ("[I]f the notice of appeal ... was filed before the district court ruled on a timely Rule 59 motion, we do not have jurisdiction."). Second, we would have jurisdiction over the second set of appeals, which were timely filed after the district court disposed of Ford's motion.
 
 
 13
 On the other hand, if Ford's motion for a new trial were deemed improper, a contrary set of propositions ensue. First, we would have jurisdiction over the first set of appeals, since they were timely filed after the district court's entry of final judgment. Second, we would not have jurisdiction over the second set of appeals, since they were filed well after the thirty days allowed by the Federal Rules of Appellate Procedure. Fed.R.App.P. 4(a)(1).
 
 
 14
 In arguing that Ford's motion was invalid, Altran focuses on the scope of service. When Ford first filed its claims against Altran, it also sued several other defendants.[4] At the time Ford moved for a new trial, those defendants were parties to the action. Although those defendants neither participated in the January trial nor were bound by the jury verdict, having agreed previously to the entry of consent judgments in October, 1989, they were not formally dismissed from the case until after the motion. It is undisputed that Ford served only Altran with its motion, and that the other defendants were not timely served.
 
 
 15
 Rule 59 requires that a "motion for a new trial shall be served not later than 10 days after the entry of the judgment." Rule 5 states that where service is required, the motion "shall be served upon each of the parties." Because Ford did not comply with the Rule 5 requirements by failing to serve "each of the parties," Altran argues that Ford's motion was completely invalid.
 
 
 16
 We disagree. When the Rule 59 motion was filed, the unserved defendants were technically still parties to the action, and therefore should have been served. If any of the unserved parties were aggrieved by the deficient service, they could complain. But Altran was served, and generally, parties may not assert the rights of others. Altran has cited no authority holding that a party served with a new trial motion may contend on appeal that the motion was a nullity because other parties were not served.[5]
 
 
 17
 The United States Court of Appeals for the Second Circuit rejected a similar argument in Rosen v. Dick, 639 F.2d 82 (2d Cir.1980), and we endorse its reasoning. In Rosen, a party that had been served with a jury trial demand contended that the demand was ineffective because other parties had not been served, as is required by Fed.R.Civ.P. 38(b). Distinguishing between the unserved parties and the party that had received service, the Rosen court stated that the latter party "should not be heard now to complain" regarding the lack of service on others. Id. at 90. Since Altran was properly served in this instance, it too cannot contest the adequacy of service.[6]
 
 
 18
 We therefore hold that Ford's motion was valid with respect to Altran. As such, we have jurisdiction over the second set of appeals at Nos. 90-5348 and 90-5363. Appeals at Nos. 90-5225 and 90-5256 are of no effect because they were filed during the pendency of the valid Rule 59 motion and will be dismissed for lack of appellate jurisdiction.
 
 III.
 
 19
 Having ascertained the boundaries of our jurisdiction, we now turn to Altran's counterclaim, in which Altran alleged that the 1970 divestment order divested Ford of the Ghosted GT, that Ford fraudulently concealed its retention and continued use of the Ghosted GT, and that this fraudulent concealment constitutes a RICO violation. The centerpiece of Altran's counterclaim is the 1970 divestiture order, which states in relevant part:
 
 
 20
 No later than eighteen (18) months after this Judgment is not subject to further appeal, Ford shall divest itself of all of its interest in the tradename and trademark "Autolite" and all of its facilities in the United States for the production of automotive batteries and spark plugs, except a battery plant located at Shreveport, Louisiana. Said production facilities shall be divested in going, viable and operating condition.
 
 
 21
 The assets to be divested shall include the tradename and trademark "Autolite" and the spark plug and battery production facilities which were acquired from the Electric Autolite Company by Ford in 1961, and all improvements, betterments, replacements and additions made thereto by Ford since such acquisition up to the date of the divestiture.
 
 
 22
 Divestiture of the facilities for the production of automobile batteries may be made separately but in any event, the tradename and trademark "Autolite" and the facilities for the production of spark plugs (hereinafter referred to as Autolite assets) shall be disposed of as a unit.
 
 
 23
 United States v. Ford Motor Co., 1971 Trade-Cas. (CCH) p 73,445, 1970 WL 550 (E.D.Mich.1970), aff'd 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972), modified 1983-1 Trade-Cas. (CCH) p 65,436, 1974 WL 1031 (E.D.Mich.1974).
 
 
 24
 Altran contends that the language in the order requiring Ford to divest "all improvements, betterments, replacements and additions" refers to additions to the "Autolite" name and that the Ghosted GT constitutes just such an addition. It then follows that Ford was required to divest the Ghosted GT. If the divestiture court did indeed order divestiture of the Ghosted GT, Altran argues that Ford fraudulently concealed its retention of the Ghosted GT from the courts, the Justice Department, and other businesses.
 
 
 25
 The district court disagreed, dismissing the counterclaim because: (1) Altran lacked standing under RICO to enforce the 1970 divestiture order; (2) the 1970 divestiture order did not divest Ford of the Ghosted GT; (3) Ford did not fraudulently conceal its retention and use of the Ghosted GT; and (4) the Justice Department could not have been so grossly negligent as to sit by idly while Ford openly flouted the terms of the divestiture order. Any of the first three of these grounds, if supported by the record, would be sufficient to affirm the district court's dismissal.[7]
 
 
 26
 Before commencing our review of the district court's action, we must first determine what exactly the district court did. Ford's motion to dismiss the counterclaim was made pursuant to Rule 12(b)(6). The district court made no explicit determination it was going to treat the motion as anything but one for failure to state a claim. However, Rule 12(b) states in part that if:
 
 
 27
 matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
 
 
 28
 Fed.R.Civ.P. 12(b)(6). Here, both Ford and Altran submitted additional factual material in support of its motion, material which the district court apparently did not exclude. Indeed, the district court expressly considered extrinsic evidence regarding the Justice Department's alleged knowledge of the Ghosted GT, and its inactivity in that respect. Thus, we are constrained by the above language to treat the district court's disposition of the matter pursuant to Rule 56, and not Rule 12(b)(6). See Switlik v. Hardwicke Co., Inc., 651 F.2d 852, 856-57 (3d Cir.1981) (since the district court did not exclude an affidavit which was outside the pleadings, Rule 12(b)(6) motion converted into summary judgment motion); Messer v. Virgin Islands Urban Renewal Board, 623 F.2d 303, 307 (3d Cir.1980) ("where matters outside the pleadings are considered by the district court, a motion under Fed.R.Civ.P. 12(b)(6) ... will be treated as a Rule 56 motion").
 
 
 29
 This presents a problem. Altran was not given a "reasonable opportunity," consistent with the mandate of Rule 12(b), to present additional evidence. For example, Altran indicated in its brief opposing Ford's motion that if the district court was going to convert the motion into one for summary judgment, it would file a statement under Rule 56(f) demonstrating its inability to produce evidence in opposition to the motion. The district court did not reply and no statement was filed. In this circuit, "it is reversible error for a district court to convert a motion under Rule 12(b)(6) ... into a motion for summary judgment unless the court provides notice of its intention to convert the motion and allows an opportunity to submit materials admissible in a summary judgment proceeding." Rose v. Bartle, 871 F.2d 331, 342 (3d Cir.1989).[8] Failure to provide such an opportunity, though, does not "require automatic reversal; it may be excused if the failure was a 'harmless error'," id., or if no prejudice to Altran occurred. Switlik v. Hardwicke Co., Inc., 651 F.2d at 857. Thus, even where the opportunity to submit pertinent material is not given, "a grant of summary judgment for a defendant may be affirmed where there is no 'state of facts on which plaintiff could conceivably recover.' " Hancock Industries v. Schaeffer, 811 F.2d 225, 229 (3d Cir.1987) (quoting Davis Elliott International, Inc. v. Pan American Container Corp., 705 F.2d at 708); accord Rose v. Bartle, 871 F.2d at 342.
 
 
 30
 Our review of summary judgment motions is plenary. "We may affirm if, and only if, on the basis of the complaints filed by these [parties] there was no set of facts which could be proven to establish" liability. Rose v. Bartle, 871 F.2d at 342. Moreover, we will consider any additional evidence in the record before us, even though that evidence may have been submitted to the district court after it had ruled on Ford's motion, in order to avoid any prejudice to Altran and as part of our plenary review.[9]
 
 
 31
 We begin our review of Altran's RICO counterclaim with standing. The United States Supreme Court has recognized that only the parties to a court order or decree have the power to enforce it. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975) (there is a "well-settled line of authority ... establish[ing] that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefitted by it."). Yet under RICO, a plaintiff has standing to assert a civil cause of action if he is "injured in his business or property" by racketeering activity. 18 U.S.C. Sec. 1964(c). See Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1164 (3d Cir.1989) ("an injury to business or property ... is in common parlance referred to as RICO standing.").
 
 
 32
 To some extent, then, we have conflicting authority. While Altran does not have standing to enforce the divestiture order directly, it does have standing to claim that Ford's violation of the order was a predicate act forming the basis of a RICO claim because Altran has alleged injury to business. We recognize that violations of the divestiture order could be a predicate act, even though the success of the RICO claim largely depends on what could be termed an enforcement of the 1970 court order. Although we have not yet had occasion to address this conflict, Securities Investor Protection Corp. v. Vigman, 908 F.2d 1461 (9th Cir.1990) ("SIPC"), is most helpful.
 
 
 33
 In SIPC, plaintiff brought a RICO suit based on predicate acts of securities fraud under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5, 17 C.F.R. Sec. 240.10b-5. To bring a Rule 10b-5 private damages action, "a plaintiff must be a purchaser or seller of securities." Id. at 1465. The district court granted summary judgment against plaintiff, concluding that it did not have standing to assert its RICO claim because the plaintiff was not a purchaser or seller of securities. Reversing the district court's judgment, the court of appeals held that "the purchaser or seller standing limitation that applies to 10b-5 actions does not apply to RICO claims based upon predicate acts that are alleged to be securities fraud...." Id. at 1467. One of the rationales for this holding was that on "its face, the RICO statute has no purchaser-seller standing requirement." Id. at 1466.
 
 
 34
 The present case is analogous to SIPC. There is a standing limitation on parties trying to enforce court orders directly, just as there is a standing limitation on parties alleging Rule 10b-5 securities fraud. But consistent with the reasoning of SIPC, that limitation would not preclude a party from making a RICO claim that had as its predicate alleged violations of a court order. Indeed, the RICO statute has no such express limitation. The standing inquiry in any civil RICO case depends solely on demonstrating injury to business or property, and not on satisfying any standing requirement attached to the predicate act. Thus, we hold that Altran has standing under RICO, even though it was not a party to the court order which provides the predicate for its RICO counterclaim.
 
 
 35
 Having concluded that Altran has standing to raise its RICO claim, we turn now to the divestiture order. Obviously, the linchpin of Altran's counterclaim is the divestiture order, since without a requirement that Ford divest the Ghosted GT, Ford would have nothing to conceal or retain. The dispute between Altran and Ford with respect to the divestiture order is one of interpretation. While Altran contends that the "additions" clause in the order applies to the "Autolite" name, along with the battery and spark plug facilities, it is Ford's position that the "additions" language applies just to the plants. Alternatively, Ford argues that the Ghosted GT is not an addition.
 
 
 36
 Court orders "must ordinarily be interpreted by examination of only the 'four corners' of the document." United States v. Reader's Digest Ass'n, Inc., 662 F.2d 955, 961 (3d Cir.1981). See Eaton v. Courtaulds of North America, Inc., 578 F.2d 87, 90 (5th Cir.1978) ("If possible, we are required to analyze a contract's meaning by its language without resort to extrinsic considerations.") (construing a consent decree). Should there be "any ambiguity or obscurity or if the judgment fails to express the rulings in the case with clarity or accuracy, reference may be had to the findings and the entire record for the purpose of determining what was decided." Security Mutual Casualty Co. v. Century Casualty Co., 621 F.2d 1062, 1064 (10th Cir.1980). See United States v. Motor Vehicles Manufacturers' Ass'n, 643 F.2d 644, 650-51 (9th Cir.1981) ("While the district court is bound to construe the judgment by the meaning to be found within its 'four corners,' the court may also consider the surrounding circumstances at formation as aids in construing the judgment.") (citations omitted); Eaton v. Courtaulds of N.A., Inc., 578 F.2d at 91 ("Where ambiguities exist in the language of a consent decree, the court may turn to other 'aids of construction,' such as other documents to which the consent decree refers, as well as legal materials setting the context for the use of particular terms."). Moreover, "prohibited conduct will not be implied from such orders; ... they are binding only to the extent they contain sufficient description of the prohibited or mandated acts. The long-standing, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt." Ford v. Kammerer, 450 F.2d 279, 280 (3d Cir.1971). In making these determinations, it "is our responsibility to construe a judgment as to give effect to the intention of the court, not to that of the parties." United States v. 60.22 Acres of Land, More or Less, Situate in Klickitat County, State of Washington, 638 F.2d 1176, 1178 (9th Cir.1980).
 
 
 37
 With these principles in mind, we undertake the difficult task of determining whether the "additions" language of the 1970 divestiture order applies to the Autolite name.[10] The four corners of the divestiture order are not particularly helpful. Attached as it is to the end of the paragraph, the "additions" clause could logically be given either of the readings urged by the parties. There is nothing in the order which would favor one reading over the other. No provision in the order specifically covers the Ghosted GT. Moreover, neither reading, if adopted, would do injustice to the overall tenor of the order, nor would either alter or render meaningless a specific provision.[11] In short, there is no clear indication on the face of the order as to the scope of the "additions" language.
 
 
 38
 Because the "additions" clause is ambiguous, we are forced to rely on the circumstances surrounding the drafting of the order and other aids of construction. We stress again that the order is to be construed according to the divestment court's intent, not the intent of the parties. United States v. 60.22 Acres of Land, 638 F.2d at 1178. Both Altran and Ford offer considerable evidence as to what the parties to the 1970 divestiture order knew, thought, or intended. For example, Altran relies heavily on sworn statements by the Justice Department attorneys who handled U.S. v. Ford, statements which voiced those attorneys' belief that the "additions" language of the 1970 order required Ford to divest the Ghosted GT. On the other hand, Ford claims that the Justice Department actually knew, or at least had constructive knowledge of the link between the Ghosted GT and the "Autolite" name. To that end, Ford offers evidence of its extensive marketing of the Ghosted GT, and a letter sent by an unidentified person to the Justice Department person pointing out Ford's use of the Ghosted GT with the "Autolite" name prior to divestiture, and its use of the Ghosted GT with the "Motorcraft" name after divestiture. Ford contends that this knowledge, when combined with the lack of an explicit provision in the divestment order covering the Ghosted GT or any post-order action to prevent Ford's continuing use of the Ghosted GT, evinces the government's intention not to include the Ghosted GT among the divested assets.[12] Altran counters with affidavits from the Justice Department attorneys demonstrating that the government had no knowledge of the connection between the Ghosted GT and the "Autolite" name and therefore had no intention of allowing Ford to keep the Ghosted GT.
 
 
 39
 However, because this evidence concerns the state of mind of the parties to the divestiture proceeding, it is irrelevant. Most significant in our construction of the divestment order is the evidence offered to prove the divestiture court's mindset. To that effect, Ford provides convincing proof that the divestiture court did not intend the "additions" language to apply to the "Autolite" name, and in turn, the Ghosted GT.
 
 
 40
 For example, between the time that the Justice Department began legal proceedings and the time the divestment order was finalized, Ford linked the Ghosted GT to the "Autolite" name through extensive advertising and marketing. Automobile parts were sold in packaging bearing not only the "Autolite" name, but the Ghosted GT as well. To paraphrase the district court, Ford's use of the Ghosted GT was "open and notorious." A logical inference to be drawn from the public nature of Ford's retention of the Ghosted GT is that the divestiture court had knowledge of the fact that the Ghosted GT could have been the legitimate subject of the divestiture order.
 
 
 41
 But we need not rely solely on inference. Exhibit C, introduced at the hearing on relief prior to the drafting of the final order, clearly showed Ford's use of the Ghosted GT in conjunction with the Autolite mark. Under the circumstances, there can be little doubt that the divestiture court knew of the Ghosted GT.
 
 
 42
 Despite this knowledge, nothing in the divestment order specifically mentioned the Ghosted GT. It would seem that something so material and so vivid as the Ghosted GT would have drawn the divestiture court's attention during the drafting of the order. That it did not reflects the divestiture court's intention to divest only the "Autolite" name, and not the Ghosted GT addition. See Ideal Toy Corp. v. Plawner Toy Mfg. Corp., 685 F.2d 78, 83 (3d Cir.1982) ("The degree of particularity ... depends on the nature of the subject matter."). We are therefore not convinced that the divestiture court would have utilized the "additions" language as a means of including the Ghosted GT among the assets to be divested if it indeed intended that result.
 
 
 43
 Altran is not left without a viable argument. Before the drafting of the final order, Ford specifically requested the divestiture court to delineate the assets to be divested and to limit the "additions" phrase to the parts plants. This request was denied. Altran argues that this denial indicated the divestiture court's intent to apply the "additions" language to the "Autolite" name. But this evidence is not as persuasive as Altran suggests, since the divestiture court, fully aware of the request, did not make the "additions" language specifically applicable to the "Autolite" name. Clearly, Ford's request for the limiting language alerted the divestiture court that there would be some disagreement about the scope of the divestiture order ultimately drafted. Since the divestiture court did not explain its reason for excluding the limiting language, there is little we can glean from this incident.
 
 
 44
 Our search beyond the four corners of the order, then, has produced mixed signals. On balance, though, these aids of construction favor a finding that the "additions" language does not apply to the "Autolite" name, and therefore, the 1970 divestment order did not require Ford to divest the Ghosted GT. Particularly germane to this case is the "long-standing, salutary rule" that "ambiguities and omissions in orders redound to the benefit of the person" allegedly disobeying the order. Ford v. Kammerer, 450 F.2d at 280.[13] Given the facial ambiguity of the order, the evidence supporting Ford's construction of the 1970 order, the lack of any reference to the Ghosted GT in the order, and the difficulty in interpreting an order twenty years after the fact, we believe that the application of this rule requires construing the order in favor of Ford. Because we conclude that there is no set of facts on which Altran could possibly prevail, we will affirm the district court's grant of summary judgment to Ford on Altran's RICO counterclaim.[14]IV.
 
 
 45
 At the same time the district court ruled on the RICO counterclaim of Altran, it also denied Ford's motion for imposition of Rule 11 sanctions against Altran for making the counterclaim in the first place. Ford now seeks review of this denial.
 
 
 46
 A district court's decision with respect to Rule 11 sanctions is subject to review for abuse of discretion. Cooter & Gell v. Hartmarx Corp., --- U.S. ----, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990); Jones v. Pittsburgh Nat. Corp., 899 F.2d 1350, 1357 (3d Cir.1990).[15] The legal standard to be applied when evaluating conduct allegedly violative of Rule 11 is reasonableness under the circumstances, Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., --- U.S. ----, ----, 111 S.Ct. 922, 931-932, 112 L.Ed.2d 1140 (1991), with reasonableness defined as an "objective knowledge or belief at the time of the filing of a challenged paper" that the claim was well-grounded in law and fact. Jones v. Pittsburgh National Corp., 899 F.2d at 1359. See Schering Corp. v. Vitarine Pharmaceuticals, Inc., 889 F.2d 490, 496 (3d Cir.1989) ("The rule requires a reasonable inquiry into both the facts and the law supporting a particular pleading."). Generally, sanctions are prescribed "only in the 'exceptional circumstance' where a claim or motion is patently unmeritous or frivolous." Doering v. Union County Board of Chosen Freeholders, 857 F.2d 191, 194 (3d Cir.1988) (citations omitted).
 
 
 47
 Although we have held that the district court properly granted summary judgment to Ford on Altran's RICO counterclaim, we do not find the claim to be utterly without merit. As we have noted, Altran's RICO counterclaim rises and falls with the interpretation of the 1970 divestiture order, specifically, whether the "additions" language applies to the "Autolite" name. Ford contends that the unambiguous language of the order preempts Altran's argument, and that any reasonable inquiry would have revealed the paucity of law and fact supporting Altran's position. But the language of the order is not as clear as Ford suggests. Indeed, we found it to be ambiguous. Were a number of individuals to read the order, it could reasonably be expected that a handful would adopt Altran's construction of the order. Most, we believe, would find the language ambiguous, but that is not to say that Altran's claim is frivolous. It seems that in most cases where a court order is ambiguous, any interpretation would be reasonable for the purposes of Rule 11, so long as it stays within the framework established by the surrounding language. Therefore, Altran's construction of the order, though we decline to adopt it, is nevertheless reasonable.
 
 
 48
 Altran is on shakier ground, though, with its allegation that Ford engaged in a pattern of racketeering activity by fraudulently concealing its unlawful retention and use of the Ghosted GT. Several incidents purportedly support Altran's theory of fraudulent concealment. First, Altran states that Ford concealed its use of the Ghosted GT in connection with the "Autolite" name from the divestiture court and the Justice Department. This contention borders on the unbelievable, since Ford extensively advertised and marketed the Ghosted GT with the "Autolite" name before the final order, and exhibits presented by Ford at the relief hearing held prior to the final order clearly demonstrated such use.
 
 
 49
 Second, Altran argues that Ford intentionally delayed its legal campaign against alleged counterfeiters for almost a decade because it did not wish to attract attention to its unlawful retention of the Ghosted GT until after the Autolite divestiture had faded from memory. This contention, too, is without support in the record. Ford's timing in bringing its suits could be readily explained by the growing public awareness of the problem of counterfeit parts. That Ford had previously advertised, marketed, and sold automobile parts emblazoned with the Ghosted GT for many years, and had the "Motorcraft" name registered as a federal trademark, make Altran's argument even more incredible.
 
 
 50
 The final component of Altran's fraud claim saves it from the spectre of Rule 11 sanctions. Altran contends that in the court-ordered sale of Autolite assets to Bendix, Ford purposefully blacked out the Ghosted GT in a section of the sales agreement listing trademarks Ford desired to retain. According to Altran, this was done to prevent the Justice Department from discovering Ford's retention of the Ghosted GT in its final review of the sale. There is no doubt that the Ghosted GT was blacked out; on the other hand, there is no proof that Ford knowingly and fraudulently eliminated the reference to the Ghosted GT in the Bendix sales agreement. Thus, it is possible that Ford did indeed commit an act of fraud. It is also possible that this act would constitute a pattern of racketeering activity under 18 U.S.C. Sec. 1961(5). While these questions, which we do not decide today, pose formidable hurdles for Altran, we cannot say that Altran's claim in this respect is patently frivolous.
 
 
 51
 In short, we are unconvinced that the district court abused its discretion in denying Ford's motion seeking Rule 11 sanctions against Altran, since there was a reasonable, albeit tenuous, factual basis for the RICO counterclaim.
 
 V.
 A. Copyright and Trademark Law
 
 52
 We now focus our attention on the district court's denial of Ford's Rule 59 motion for a new trial, which followed a jury verdict in favor of Altran on claims that it infringed Ford's copyright and trademark rights. A denial of a motion for a new trial is reviewed "only for abuse of discretion unless the court's denial of the motion is based on the application of a legal precept, in which case our review is plenary." Honeywell v. American Standards Testing Bureau, Inc., 851 F.2d 652, 655 (3d Cir.1988). See also Levinson v. Prentice-Hall, Inc., 868 F.2d 558, 562 (3d Cir.1989); Link v. Mercedes-Benz of North America, 788 F.2d 918, 921 (3d Cir.1986). Such denials are improper only if "the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably [decline to] afford relief." Wagner v. Firestone Tire & Rubber Co., 890 F.2d 652, 656 (3d Cir.1989) (citation omitted). Our duty "is to uphold the jury's award if there exists a reasonable basis to do so." Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir.1989). This scope of review has been described as "highly deferential." Id. at 1229.
 
 
 53
 Before evaluating the sufficiency of the evidence, we first look at the legal principles governing this case. Our analysis is divided into two parts. First, we will examine what Ford would need to show in order to prove a copyright violation, and second, what evidence would be required to establish a trademark violation.
 
 
 54
 (1) Copyright Infringement
 
 
 55
 Copyright infringement is established if the plaintiff proves that it owned the copyrighted material and that the copyrighted material was copied by the defendant. Masquerade Novelty, Inc. v. Unique Industries, Inc., 912 F.2d 663, 667 (3d Cir.1990); Whelan Associates v. Jaslow Dental Laboratory, 797 F.2d 1222, 1231 (3d Cir.1986); Major League Baseball Promotion Corp. v. Colour-Tex, Inc., 729 F.Supp. 1035, 1039 (D.N.J.1990).
 
 
 56
 Certificates of registration issued by the U.S. Copyright Office constitute prima facie evidence of the validity and ownership of the material. Andrien v. Southern Ocean County Chamber of Commerce, 927 F.2d 132, 134 (3d Cir.1991); Williams Electronics, Inc. v. Artic International, Inc., 685 F.2d 870, 873 (3d Cir.1982). Copying is a "shorthand reference to the act of infringing any of the copyright owner's five exclusive rights set forth at 17 U.S.C. Sec. 106," Paramount Pictures v. Video Broadcasting Systems, 724 F.Supp. 808, 819 (D.Kan.1989), including the rights to distribute and reproduce copyrighted material. Because direct evidence of copying is rarely available, it may be inferentially proven by "showing that the defendant had access to the allegedly infringed work, ... that the allegedly infringing work is substantially similar to the copyrighted work," Whelan Associates v. Jaslow Dental Laboratory, 797 F.2d at 1232, and, of course, that one of the rights guaranteed to copyright owners by 17 U.S.C. Sec. 106 is implicated by the defendant's actions.
 
 
 57
 "Substantial similarity" can be broken down into two tests, both of which must be met. The first, termed the "extrinsic test," is "whether there is sufficient similarity between the two works in question to conclude that the alleged infringer used the copyrighted work in making his own." Id. In making this determination, expert testimony and a visual comparison between the copyrighted work and the allegedly infringing work are frequently utilized. Universal Athletic Sales Co. v. Salkeld, 511 F.2d 904, 907 (3d Cir.1975). A second test of "substantial similarity," called the "intrinsic test," is whether, from a lay perspective, the copying was an unlawful appropriation of the copyrighted work. Whelan Associates v. Jaslow Dental Laboratory, 797 F.2d at 1232; Universal Athletic Sales Co. v. Salkeld, 511 F.2d at 907. "Unlawful appropriation" has been defined as "a taking of the independent work of the copyright owner which is entitled to the statutory protection." Universal Athletic Sales Co. v. Salkeld, 511 F.2d at 908. Several factors should be considered when determining if an appropriation occurred, including the reciprocal relationship between creativity and independent effort,[16] "the nature of the protected material, and the setting in which it appears." Id. In short, copying is demonstrated when someone who has access to a copyrighted work uses material substantially similar to the copyrighted work in a manner which interferes with a right protected by 17 U.S.C. Sec. 106.[17]
 
 
 58
 (2) Trademark Infringement
 
 
 59
 Trademark infringement is established if the plaintiff proves that "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 192 (3d Cir.1990).
 
 
 60
 If the mark at issue was federally registered and had become "incontestable", pursuant to 15 U.S.C. Secs. 1058 and 1065, validity, legal protectability, and ownership are proved. Id. at 194. Where a mark has not been federally registered or has not achieved incontestability, validity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive. A.J. Canfield Co. v. Honickman, 808 F.2d 291, 296 (3d Cir.1986); 1 McCarthy, Trademarks and Unfair Competition (2d ed. 1984) at Secs. 11:16, 15:1.[18] Secondary meaning is demonstrated where, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself." Freixenet, S.A. v. Admiral Wine & Liquor Co., 731 F.2d 148, 152 (3d Cir.1984) (citation omitted). "Although there are numerous cases determining secondary meaning, there is no consensus on its elements." American Scientific Chemical, Inc. v. American Hospital Supply Corp., 690 F.2d 791, 792 (9th Cir.1982). A non-exclusive list of factors which may be considered includes the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the company, the number of sales, the number of customers, and actual confusion. See CIBA-GEIGY Corp. v. Bolar Pharmaceutical Co., Inc., 747 F.2d 844, 852 (3d Cir.1984); 20th Century Wear, Inc. v. Sanmark-Stardust Inc., 747 F.2d 81, 90 (2d Cir.1984); Freixenet, S.A. v. Admiral Wine & Liquor Co., 731 F.2d at 152; American Scientific Chemical, Inc. v. American Hospital Supply Corp., 690 F.2d at 792-93; Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228 (3d Cir.1978); 1 McCarthy, Trademarks and Unfair Competition at Secs. 15:10-21.
 
 
 61
 With respect to ownership of unregistered marks, the first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce. Tally-Ho, Inc. v. Coast Community College District, 889 F.2d 1018, 1022-23 (11th Cir.1989) ("actual and continuous use is required to acquire and retain a protectible interest in a mark," while the "first to use a mark on a product ... in a ... market acquires rights in the mark in that market"); Hydro-Dynamics, Inc. v. George Putnam & Co., Inc., 811 F.2d 1470, 1473 (Fed.Cir.1987) ("trademark rights in the United States are acquired by ... adoption and use, not by registration"); Kohler Mfg. v. Beeshore, 59 F. 572, 576 (3d Cir.1893) (there must be an intention "to adopt [the mark] as a trademark"); Caesar's World, Inc. v. Caesar's Palace, 490 F.Supp. 818, 822 (D.N.J.1980) ("Common law rights are acquired in a ... mark by adopting and using the mark....").
 
 
 62
 Besides validity and ownership, a plaintiff must also prove likelihood of confusion, which is said to exist "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d at 1229. "Proof of actual confusion is not necessary; likelihood is all that need be shown." Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d at 195. The likelihood of confusion analysis requires the evaluation of a number of factors, among them:
 
 
 63
 (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sale efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.
 
 
 64
 Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d at 1229.
 
 
 65
 Perhaps the most important of these factors is the first on the Scott Paper list: the degree of similarity between the two marks. We recently held that "if the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.' " Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d at 195 (quoting 2 McCarthy, Trademarks and Unfair Competition at Sec. 23:7).
 
 
 66
 One other point with regards to likelihood of confusion merits discussion. It is well-established that likelihood of confusion "should be determined by viewing the two marks from the perspective of an ordinary consumer of the goods or services." Dominion Bankshares Corp. v. Devon Holding Co., Inc., 690 F.Supp. 338, 345 (E.D.Pa.1988). See 2 McCarthy, Trademarks and Unfair Competition at Secs. 23:27-29. The degree of caution used by these ordinary consumers (or "reasonably prudent buyers," as they are often called) depends on the relevant buying class. That is, some buyer classes, for example, professional buyers, or consumers of very expensive goods, will be held to a higher standard of care than others. Where the buyer class "consists of both professional buyers and consumers then the issue will center on the consumers, for confusion within the lowest stratum of 'reasonably prudent buyers' may give rise to liability even if professional buyers in the market are not confused." Worthington Foods, Inc. v. Kellogg Co., 732 F.Supp. 1417, 1448 (S.D.Ohio 1990). See 2 McCarthy, Trademarks and Unfair Competition at Sec. 23:28 (if "the relevant buyer market consists of both discriminating and casual purchasers, the court must give consideration to likely confusion of the casual, ordinary buyers."). Thus, when a buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class.
 
 B. The Transgo "Shift Kit" Infringement
 
 67
 In light of this survey of the relevant law, we must now decide if there was a sufficient quantum of evidence presented at trial to uphold the jury's verdict. Two separate allegations of copyright and trademark infringement were leveled against Altran. We will examine each allegation in turn.
 
 
 68
 The facts underlying Ford's first allegation are largely undisputed. At trial, it was established that for approximately ten years, Altran purchased "Shift Kit" automotive valve body kits from Transgo, a manufacturer of automobile transmission parts. These valve body kits were individually packaged by Transgo in boxes bearing trade dress closely resembling the Ghosted GT.[19] Altran would then resell the transmission kits in the original packaging. Ford charges that the act of reselling the kits with the Ghosted GT trade dress violated both copyright and trademark laws.
 
 
 69
 (1) The Copyright Claim
 
 
 70
 To succeed on its copyright claim, Ford had to prove ownership and copying. Whelan Associates v. Jaslow Dental Laboratory, 797 F.2d at 1231. At trial, Ford introduced certified copies of United States Copyright Registrations issued to Ford for the Ghosted GT, and an affidavit stating that Ford created the Ghosted GT in conjunction with Ford and Earl Design Associates in 1966. The registrations themselves are prima facie proof of Ford's ownership of the Ghosted GT and its validity, Williams Electronics, Inc. v. Artic International, Inc., 685 F.2d at 873, while the affidavit further reinforces the idea that Ford created and owns the Ghosted GT.
 
 
 71
 Ford did not present any direct evidence that the "Shift Kit" packaging was actually copied from the Ghosted GT, but rather, attempted to prove it inferentially. The predicate to demonstrating copying is a showing that Ford had an exclusive right as owner of the copyright. Since it is undisputed that Altran sold parts in boxes with trade dress resembling the Ghosted GT, Ford's right under 17 U.S.C. Sec. 106(3) to distribute copies to the public by sale is obviously implicated. Ford Motor Co. v. B & H Supply, Inc., 646 F.Supp. 975, 989 (D.Minn.1986). It also seems clear that because the Ghosted GT trade dress was distributed nationally via advertisements and reproductions on parts packaging, Altran had ready access to the Ghosted GT.
 
 
 72
 The only remaining question with respect to the copyright claim against Altran for selling the "Shift Kit" valve body kits is whether the Ghosted GT and "Shift Kit" trade dress are substantially similar. A comparison between the two reveals that the trade dresses are virtually identical. Both bear the blurred blue image of a speeding car;[20] indeed, it appears that the "Shift Kit" speeding car is no more than a photo-mechanical copy of Ford's Ghosted GT. The only difference occurs at the top of the packaging, where either the trademark "Shift Kit" and related information or a "Ford" trademark and the name "Motorcraft" appears. Thus, the extrinsic copying test is satisfied. See Whelan Associates v. Jaslow Dental Laboratory, 797 F.2d at 1232.[21]
 
 
 73
 Additionally, Ford prevails on the intrinsic test for determining substantial similarity, since there can be little doubt that the copying was an unlawful appropriation. The factors which we stressed as important in Universal Athletic Sales Co. v. Salkeld, 511 F.2d at 908, all point to finding that the Ghosted GT was illicitly appropriated. For example, the level of creativity and independent effort on Ford's part was great. The Ghosted GT is not merely a representation of a car, but was creatively designed in such a way as to capture the elements of speed and performance. Furthermore, Ford did not settle for a blurred photograph of a Ford Mustang GT to convey that image, but worked with a design company to create a graphic simulating such a photograph. That Ford created the graphic is also important in another sense, since artistic works are more likely to be protected than works of a more commercial nature. Id. We conclude that the Ghosted GT was unlawfully appropriated. Ford has therefore met, to our satisfaction, its burden of proving copying.
 
 
 74
 Hence, there is a presumption that Ford has established the elements of a copyright infringement. See e.g. Keller Brass Co. v. Continental Brass Co., 862 F.2d 1063, 1065 (4th Cir.1988); Benson v. Coca-Cola Co., 795 F.2d 973, 974 (11th Cir.1986); Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1018 (9th Cir.1985). But Altran attempts to rebut the presumption of copying on two grounds.
 
 
 75
 First, Altran argues that Transgo independently created the Ghosted GT. If indeed the Ghosted GT was independently created, Altran could not have committed a copyright violation by its actions. Id. To that end, Altran offered the testimony of Gil Younger, the president of Transgo. Younger claimed that the trade dress on his "Shift Kit" packaging was inspired by a poster of a race driver's car hanging on his office wall, and not by the Ghosted GT of Ford. The president of Altran, Alfred Schlanger, recollected seeing the poster on the wall in Younger's office.
 
 
 76
 Younger's testimony and Schlanger's corroboration are considerably weakened, though, by Younger's admission that the poster in his office might have been a Ford "Autolite" poster. Since Ford created the Ghosted GT in 1966, prior to Transgo's initial use of the trade dress, it is entirely possible that there was a Ford poster hanging on the wall. Moreover, Younger agreed to stop using the Ghosted GT on "Shift Kit" packaging at Ford's request, something Younger was unlikely to have done if he actually believed that the design on his packaging was independently created. Furthermore, the uncanny similarity between the Ghosted GT and the "Shift Kit" trade dress points in two different directions: either the "Shift Kit" trade dress was copied from an "Autolite" poster, or there was no poster and Transgo copied it directly from the Ghosted GT. Neither supports an independent creation argument. Given these considerations, little weight should have been accorded the Younger testimony. Thus, this evidence falls well short of that minimum quantum needed to support Altran's independent creation theory.
 
 
 77
 Second, Altran posits that Ford abandoned its copyright by failing to affix a proper copyright notice to four million copies of the Ghosted GT which appeared in Ford catalogs and parts lists. "In general, publication of a work without a proper notice of copyright affixed injects the work into the public domain." Shapiro & Son Bedspread Corp. v. Royal Mills Ass'n, 764 F.2d 69, 72 (2d Cir.1985). However, federal copyright law provides that omission of copyright notice will not invalidate a copyright if "the notice has been omitted from no more than a relatively small number of copies ... distributed to the public." 17 U.S.C. Sec. 405(a)(1). There is no easy answer to the question of what constitutes "a relatively small number of copies." Donald Frederick Evans and Associates, Inc. v. Continental Homes, Inc., 785 F.2d 897, 909-10 (11th Cir.1986) ("Courts and commentators disagree as to what constitutes 'no more than a relatively small number of copies.' "). Whatever the result may be in a given case, the question of what is a relatively small number "cannot be answered merely by reference to an absolute number.... The question must be answered on a case-by-case basis in light of the totality of the circumstances." Id. at 910.
 
 
 78
 This vexatious question, however, is not properly before us, since the jury never reached the issue of abandonment through publication without notice. The verdict form, in relevant part, read as follows:
 
 
 79
 1. Do you find Altran Corporation has infringed a Ford Motor Company copyright?
 
 YES NO
 
 80
 If, but only if, your answer to question 1 was "YES", answer question 2;....
 
 
 81
 2. Has Ford abandoned the "Speeding Car" copyright?
 
 YES NO
 
 82
 In filling out this form, the jury checked "NO" in answer to question one. It did not check anything for question two. We presume, then, that the jury believed the independent creation argument of Altran, and therefore saw no need to address the abandonment issue. We will not address it for the first time in this appeal.[22]
 
 
 83
 We do note, though, that the evidence in the record before us now may not support a finding of abandonment. Consistent with its burden of proof, Altran did demonstrate that Ford failed to affix copyright notice to its Ghosted GT four million times. While in an abstract sense, four million is a large number, it becomes "relatively small" in the context of the case. The omissions occurred in catalogs sent only to Ford dealerships or within the Ford parts distribution network. Such a limited pattern of distribution minimizes the dimensions of Ford's failure to comply with copyright requirements. Ford also introduced evidence, which if true, establishes that it affixes its copyright notice to well in excess of one hundred million pieces of packaging annually.[23] Thus, it is possible that there was a maximum omission rate of four percent (four million out of one hundred million),[24] and the omissions that did occur were not widely distributed. We do not believe that under the totality of those circumstances, Ford omitted notice on more than a relatively small number of Ghosted GT copies.
 
 
 84
 To conclude our analysis of the Transgo copyright claim, we hold that Ford established the necessary elements of a copyright infringement, which Altran failed to rebut. Altran's evidence of independent creation was woefully inadequate, making it clear that the jury had no basis for declining Ford relief.
 
 
 85
 (2) The Trademark Claim
 
 
 86
 Aside from the alleged copyright violations, Ford also argued at trial that Altran infringed its trademark rights by selling the "Shift Kits." Ford needed to prove three things in order to succeed. See Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d at 192. First, it had to demonstrate that the Ghosted GT has secondary meaning; in other words, that the Ghosted GT represented Ford, and not automobile parts generally.[25] Freixenet, S.A. v. Admiral Wine & Liquor Co., 731 F.2d at 152. Utilizing the multi-factor analysis which our cases suggest, we believe that Ford proved secondary meaning. To begin, there was some evidence of actual confusion, since several of Altran's witnesses (e.g. Gerald Kimmelman) recognized that the Ghosted GT represented Ford. Running counter to that testimony are the statements of "industry" witnesses (i.e. repair shop owners) presented by Altran that the Ghosted GT did not signify Ford. There is no indication of what average consumers, rather than industry insiders, think. Hence, we are reluctant to give any of the above testimony determinative weight.
 
 
 87
 Ford nevertheless presents a considerable amount of additional evidence on the issue of secondary meaning that fits neatly within the framework of our multi-factor analysis. For example, the Ghosted GT was used from the late 1960s to the present time, during which Ford had parts sales of eighteen billion dollars and spent 118 million dollars on advertising and marketing the Ghosted GT, including advertising in trade journals. It should be noted that the advertising in trade journals rebuts Altran's claim that industry experts were not confused, since they were obviously a primary target of Ford's advertising campaign. Moreover, Ford is a very large company. These facts paint a very convincing picture of secondary meaning, and therefore must be accorded considerable weight. Another vitally important factor is evidence of copying: it can be inferred from the close resemblance of the trade dresses at issue that Transgo did indeed copy the Ghosted GT.
 
 
 88
 The only relevant response Altran musters is the vague claim that because the Ghosted GT is or was not used without the "Motorcraft" or "Autolite" name, Ford itself must not have believed that the Ghosted GT had attained secondary meaning. A flaw in this reasoning is the widespread use of the Ghosted GT by parts counterfeiters, indicative that the symbol did represent Ford to buyers. On balance, secondary meaning was clearly established.
 
 
 89
 A second element Ford had to prove for its trademark claim to succeed was ownership. During the relevant time period, the Ghosted GT was not a registered trademark,[26] so this trademark infringement claim was brought as a common law action. Ford's ownership of the Ghosted GT cannot be seriously questioned--it was the first party to adopt the trademark, and it has continuously used the Ghosted GT since the late 1960s. Tally-Ho Inc. v. Coast Community College District, 889 F.2d at 1022-23.
 
 
 90
 The final element in Ford's case for trademark infringement is likelihood of confusion. Likely confusion requires a multi-factor analysis similar to the one we engaged in during our discussion of secondary meaning, see Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d at 1229, and is to be evaluated from the standpoint of a reasonably prudent buyer occupying the lowest stratum of the relevant buyer class. See Worthington Foods, Inc. v. Kellogg Co., 732 F.Supp. at 1448. Again, the factors indicate unequivocally a likelihood of confusion. Highly probative is the degree of similarity between the competing trade dresses. Opticians Association of America v. Independent Opticians of America, 920 F.2d at 195. To stress a point made several times already, the "Shift Kit" trade dress and the "Ghosted GT" trade dress are almost identical. This fact alone gives rise to a strong inferrence of confusion.
 
 
 91
 But Ford has many other evidentiary weapons in its arsenal. The Ghosted GT is a strong mark, having been used for more than twenty years, having been extensively advertised and marketed, and having a distinctive design. Although Ford's "Motorcraft" products do not directly compete against Transgo transmission kits, Ford does market and sell to the same group of consumers closely related products in a manner similar to that utilized by Altran. Additionally, Ford's leading role in the automobile industry suggests that it is widely perceived as a party that would indeed manufacture a product in Altran's market. Lastly, intentional infringement can be inferred, since Altran, while it was selling "Shift Kit" valve body kits with Ghosted GT trade dress, knew that the Ghosted GT was used by Ford.
 
 
 92
 Altran does offer the testimony of industry witnesses who state that the professional buyer class did not confuse Transgo packaging with Ford packaging. However, this evidence is largely irrelevant. We are dealing in this case with a mixed buying class: professional buyers as well as the ultimate consumer, the car owner. In accordance with our understanding of the law, likelihood of confusion must be surveyed from the perspective of the ordinary consumer, and not the professional buyer. Worthington Foods, Inc. v. Kellogg Co., 732 F.Supp. at 1448; 2 McCarthy, Trademarks and Unfair Competition at Sec. 23:28. Hence, Altran's evidence, while perhaps indicative of the level of confusion experienced by the more expert members of the buying class, does little to prove confusion among the other members of the class, and cannot be accorded much significance.
 
 
 93
 It is apparent, then, that during the trial Ford not only proved secondary meaning and ownership, but it also demonstrated likelihood of confusion. Altran's evidence, on the other hand, does not adequately counter Ford's proof, falling well short of that critical minimum needed to affirm the jury's verdict with respect to the Transgo trademark claim. We believe a new trial on Ford's allegation of copyright and trademark infringement against Altran for selling Transgo "Shift Kit" valve body kits is an appropriate remedy.
 
 C. The Summit Plastic Bag Infringement
 
 94
 Ford made another allegation of copyright and trademark infringement against Altran, this one concerning Altran's dealings with Summit Motor Products. It was Ford's position during the trial that over a period of many years, Altran sold to Summit plastic bags with trade dress closely resembling the Ghosted GT trade dress used by Ford, and that Summit subsequently sold parts in those bags. According to Ford, a plastic bag sealing machine facilitated those efforts by printing Ford parts numbers on the bags and then sealing them.
 
 
 95
 Several witnesses testified on Ford's behalf. Sanford Landa, the president of Summit, guessed that he had purchased plastic bags from Altran with the Ghosted GT trade dress through 1984, stated that Summit put a "minor" number of parts in those bags, and believed that the parts were sold in those bags until 1984. However, the district court apparently considered Landa less than convincing, since it characterized his testimony as "all full of inconsistencies." Another witness, Michael Morales, a Summit employee, stated that he ordered bags from Altran on several occasions during the course of his employment, and that parts were sold in those bags. But his testimony was somewhat vague. For example, he could not recall the last time he placed an order for the Altran bags. Ford's private detective, Charles Baley, testified that during a raid on Summit he seized parts packaged in the counterfeit bags allegedly supplied by Altran, that there was a sealing machine and printing press on Summit premises, and that he found at least two rolls of the counterfeit bags. Baley's testimony was somewhat weakened by two admissions: first, he threw out the bags which contained parts; and second, he could not determine the origin of the bags. Moreover, it is unclear from Baley's testimony just how many seized parts were found in plastic bags. Baley itemized twenty-two separate items, but apparently a number of them were packaged in envelopes and boxes.
 
 
 96
 Ford also produced photos of the sealing machine and the distribution area, and two spools of bags supplied by Altran to Summit, one dated 1975, the other 1979. Additionally, Ford presented Summit invoices indicating purchases from Altran. These invoices, however, did not reflect what items were actually purchased. Ford did not present any witness who actually saw the sealing machine in operation. Nor could Ford produce any direct evidence that Summit parts were sold in Altran counterfeit bags. It did, however, demonstrate that some parts dealers returned counterfeit Ghosted GT plastic bags containing non-Ford parts to Ford in order to receive credit. These bags were virtually identical to those given to Summit by Altran.
 
 
 97
 Altran disputes Ford's interpretation of the evidence. Altran's president, Alfred Schlanger, testified that in the late 1970s, he bought packaging material from his former employer, who was bankrupt. Found among the materials were a few rolls of plastic bags having trade dress resembling Ford's Ghosted GT packaging. At first, Schlanger intended to throw the bags out, but when Summit's Landa mentioned in a conversation that Summit had obtained a sealing machine and needed plastic bags to test it, Schlanger gave the plastic bags to Summit at no charge. Schlanger stated that he did not believe the bags would be used to package parts destined for sale.
 
 
 98
 Whether or not Schlanger's version of the incident is true is a matter of witness credibility. Apparently, the jury embraced Schlanger's story. We cannot find fault with this decision. But even accepting Schlanger's testimony as true, the overwhelming weight of the evidence nevertheless leads to a finding of infringement.
 
 
 99
 (1) The Copyright Claim
 
 
 100
 We begin with the copyright claim. Aside from the differing circumstances, the evidence in the Summit infringement is substantially the same as the evidence presented in the Transgo infringement. Therefore, we find that Ford established its ownership of the Ghosted GT copyright and Altran's access to the copyright. Moreover, both the extrinsic and intrinsic tests of substantial similarity have been met. Regarding the extrinsic test, a visual examination of the Altran bags reveals printed red and black speeding cars practically identical to the Ghosted GT. Altran's argument that the copyright passed into the public domain by virtue of publication without notice must be disregarded because it was not considered by the jury. The copyright infringement claim, then, boils down to a question of whether a right guaranteed by section 106 of the Copyright Act was abridged. 17 U.S.C. Sec. 106.
 
 
 101
 Only one of the enumerated rights in section 106 could conceivably apply in this instance, namely, the right under section 106(3) to "distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership." Altran contends that a one-time gift to another person does not implicate section 106(3). We disagree. That the bags were a gift is of no import. The term "other transfer of ownership" is broad enough to encompass gifts. In fact, the House Report on the 1976 Amendment to the Copyright Act states during the course of a discussion on section 106(3) that the copyright owner has the right to control public distribution, "whether by sale, gift, loan, or some rental or lease arrangement." H.R.REP. NO. 94-1476, 94th Cong., 2d Sess. 62, reprinted in 1976 U.S.Code Cong. & Admin.News 5659, 5675-76 and 17 U.S.C.A. Sec. 106 (West 1977) (Historical Note) (emphasis added). This report clearly indicates legislative intent to include gifts within the scope of section 106(3).
 
 
 102
 In addition, Altran seems to argue that Schlanger did not intend to infringe any copyright law, and only gave the plastic bags to Landa so that Landa could test his machine. But it "is settled law that innocent intent is generally not a defense to copyright infringement." Williams Electronics, Inc. v. Artic International, Inc., 685 F.2d at 878.[27]
 
 
 103
 Altran also claims that section 106(3) is inapplicable because the gift to Landa was not a distribution to the "public." This argument fails because even one person can be the public for the purposes of section 106(3). The term "public" is not defined in the Copyright Act. Thus, we need to look elsewhere for a definition. Our search commences with the observation that the right protected by section 106(3) is generally referred to as that of publication. See id. (stating that section 106(3) "establishes the exclusive right of publication." (emphasis added)). Indeed, the statutory definition of "publication" is "the distribution of copies ... of a work to the public by sale or other transfer of ownership," 17 U.S.C. Sec. 101, a definition which tracks the language of section 106(3). "Publication" and the exclusive right protected by section 106(3), then, are for all practical purposes, synonymous. Therefore, any clarification of what is meant by "publication" would also clarify what is meant by section 106(3), and in particular, the term "public."
 
 
 104
 Courts have held that when deciding if a common law "publication" occurred, the "number of persons receiving copies is not determinative; a general publication may be found when only one copy of the work reaches a member of the general public...." Brown v. Tabb, 714 F.2d 1088, 1091 (11th Cir.1983). Accord Burke v. National Broadcasting Co., Inc., 598 F.2d 688, 691 (1st Cir.1979) (publication can be found "where only one copy of the work passes to a member of the general public").[28] Hence, because "publication" and the right protected by section 106(3) are the same, and because a "publication" can occur when only one member of the public receives a copyrighted work, it follows that a violation of section 106(3) can also occur when illicit copies of a copyrighted work are only distributed to one person. Obviously, in such a situation, damages may be limited, or even non-existent, but the liability for infringement remains.
 
 
 105
 Given this construction of section 106(3), there is no doubt that Altran's one-time gift to Summit's Sanford Landa of the plastic bags, however innocent, clearly falls within the scope of that section. As matter of law, therefore, Altran violated section 106(3) by its gift of the infringing bags. Thus, there was no evidence or law to buttress the jury's finding that Altran did not infringe Ford's copyright by supplying the plastic bags to Summit.
 
 
 106
 (2) The Trademark Claim
 
 
 107
 Finally, we address the plastic bag trademark claim. The evidence on secondary meaning is the same in this instance as it was in the claim arising out of the "Shift Kit" sales, with one exception: Ford proved that counterfeit plastic bags resembling the ones Altran gave to Summit and containing non-Ford parts were returned to Ford for credit. This is strong proof of actual confusion, which points towards a finding of secondary meaning. We therefore remain convinced that the Ghosted GT has secondary meaning. Moreover, as mentioned earlier, Ford has also proven ownership of a common law Ghosted GT trademark.
 
 
 108
 Likelihood of confusion is the only remaining issue in deciding whether a trademark infringement occurred. One factor in our analysis which bolsters Altran's position that there is no likely confusion concerns intent. Taking Schlanger's testimony as true, there was no intent by Altran to infringe Ford's trademark. Conversely, the trade dress on Ford packaging and the Altran-supplied plastic bags is very similar, which strongly indicates a likelihood of confusion. Other important factors in Ford's favor include the strength of the mark, the public expectation that Ford and Altran would compete in the same market, and Ford's evidence of parts returned for credit in bags almost identical to those Altran supplied to Summit. This latter evidence is solid proof of actual confusion.[29]
 
 
 109
 Ultimately, though, our decision depends on whether Summit actually packaged parts in those plastic bags. If evidence was presented supporting Altran's contention that Summit did not actually package or sell parts in those plastic bags, then the factors in the Scott Paper test relating to defendant's marketing efforts, channels of trade, targets of sale efforts, and similarity of function would all indicate that confusion was unlikely, since Summit was not marketing or selling goods with the infringing mark. But the only significant evidence presented on the issue was offered by Ford. The testimonies of Landa, Morales, and Baley, while thoroughly impeached, nonetheless reveal that Summit did package at least a handful of parts in the counterfeit bags. For example, at least one or two of the twenty-two items Baley seized were apparently packaged in Altran bags. Even a few minor transgressions,[30] though, are enough to shift the Scott Paper factors regarding marketing and sales in Ford's favor. We can only conclude, then, that there was a likelihood of confusion. Ford has therefore proven to our satisfaction secondary meaning, ownership, and likelihood of confusion. Again, Altran's evidence to the contrary provided an insufficient basis for the jury to find otherwise. As such, a new trial on both the "plastic bag" trademark claim and the related copyright claim is justified.
 
 D. Conclusion
 
 110
 To summarize, we hold that there was insufficient evidence to uphold the jury's verdict for Altran and that the district court did not properly exercise its discretion in denying Ford's motion for a new trial. We are fully aware that new trials are infrequently given and generally disfavored. But it is clear from the record that too much weight was accorded to the subjective testimony of the witnesses at trial. Insufficient consideration was given to the objective evidence, most of which strongly favored Ford's position, and the governing law. Granted, in many cases, subjective testimony is very important, with results often hinging upon a jury's determination of witness credibility. That is not our case, though. Credibility of the witnesses was neither as vital as the jury verdict indicated nor as significant as Altran would have us believe it should be. Instead, more attention should have been focused on the objective evidence presented by Ford, very little of which was rebutted by Altran. To avoid substantial injustice, we believe that a new trial is necessary on all of Ford's copyright and trademark claims.
 
 VI.
 
 111
 For all of the above reasons, we will affirm the district court's order dismissing Altran's RICO counterclaim and Ford's motion for Rule 11 sanctions. Similarly, we will vacate both the judgment against Ford on its copyright and trademark claims and the order denying Ford's motion for a new trial, and direct the district court to grant Ford a new trial on those claims. The appeals at Nos. 90-5225 and 90-5256 will be dismissed. Each side to bear its own costs.
 
 
 
 [1]
 The district court order referred to its disposal of the counterclaim as a dismissal. As will be developed infra, the district court's order, notwithstanding its nomenclature, amounted to a grant of summary judgment
 
 
 [2]
 There are several bases for the district court's jurisdiction. Ford's claims arose under the United States Copyright Act, 17 U.S.C. Secs. 101-810, and the United States Trademark Act, 15 U.S.C. Secs. 1051-1127, with jurisdiction being expressly conferred upon the district court in both instances by 28 U.S.C. Sec. 1338(a). There is also diversity jurisdiction pursuant to 28 U.S.C. Sec. 1332(a) and pendent jurisdiction pursuant to 28 U.S.C. Sec. 1338(b). Altran's claims arose under RICO, with jurisdiction expressly conferred upon the district court by 18 U.S.C. Sec. 1964(c)
 
 
 [3]
 Should we decide that we have jurisdiction over the appeals filed before the court disposed of the motion for a new trial, and not the appeals filed afterwards, Ford would be unable to claim that the jury verdict was against the weight of the evidence, since the district court at the time of the first notices of appeals did not have an opportunity to grant a new trial
 
 
 [4]
 The other defendants included Summit Motor Products, Alto Products Corp., Tension Envelope Corp., and Acme Folding Box, Inc
 
 
 [5]
 The plain language of the relevant rules does not dictate the result Altran urges. Rule 4(a)(4) of the Federal Rules of Appellate Procedure merely states that a new trial motion must be timely "filed" in order to suspend the time for filing a notice of appeal; this rule says nothing about the effect of service upon some but not all of the parties. Rule 59(b) states only that a new trial motion must be served within 10 days after entry of judgment, and Rule 5(a) states only that such a motion must be served on all parties. Nowhere do these rules provide that a new trial motion served on some but not all parties is a nullity with respect to the served parties
 
 
 [6]
 There is perhaps one exception to this general rule. If Altran had proved that it was prejudiced by the failure of Ford to properly serve the other parties, then arguably, the service was invalid with respect to Altran. But Altran made no such offer of proof
 
 
 [7]
 We do not address today the significance of the Justice Department's failure to take action against Ford, or, more specifically, whether that inaction, by itself, would have removed the taint of fraud by Ford
 
 
 [8]
 The notice and opportunity requirements are really one and the same, and will be treated as such in this opinion. See Davis Elliot International, Inc. v. Pan American Container Corp., 705 F.2d 705, 707-08 (3d Cir.1983); Bryson v. Brand Insulations, Inc., 621 F.2d 556, 559 (3d Cir.1980). The Bryson court, in a passage subsequently quoted in Davis Elliot, stated that "an opportunity to present pertinent material ... presumes notice to the party so that he may take advantage of the opportunity." Bryson v. Brand Insulations, Inc., 621 F.2d at 559
 
 
 [9]
 We are aware of the line of cases holding that we may consider on review of a grant of summary judgment only that evidence which was of record at the time the district court made its decision. See Frito Lay, Inc. v. Willoughby, 863 F.2d 1029, 1035-36 (D.C.Cir.1988); Voutour v. Vitale, 761 F.2d 812 (1st Cir.1985), cert. denied, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). However, given the harmless error analysis mandated by Rose v. Bartle, 871 F.2d at 342, we find those cases inapplicable. Implicit in Rose v. Bartle is the idea that to avoid prejudice, we must consider all the evidence on the record to determine if the error was in fact harmless
 
 
 [10]
 Were we to resolve this question in Altran's favor, we would be compelled to find that the Ghosted GT is an addition to the "Autolite" name. At the time of the 1970 order, the Ghosted GT appeared below the Autolite name on both packaging and advertisements. Prior to the introduction of the Ghosted GT, Ford used no other strong symbol to identify the "Autolite" name. Additionally, affidavits and testimony of former Ford employees, in particular, Robert Isom, Roy Knipper, Kenneth Myers, Glenn Hanna and W. Peter Lasher, strongly suggest that the Ghosted GT was designed as an addition to the "Autolite" name. Clearly, the plain meaning of the word "additions," when interpreted consistent with the above evidence, indicates that the term encompasses the Ghosted GT
 
 
 [11]
 Ford argues, quite strenuously, to the contrary. First, it complains that if the reading of the "additions" language urged by Altran is adopted, it would never be able to replace the "Autolite" name. This argument is specious, since the order clearly contemplated that any replacement for the "Autolite" name made after the divestiture was final would be allowed. Second, Ford states that Section VI(B) of the order gives it the right to continue the uninterrupted use of any name other than the "Autolite" name (with the exception being a five-year ban on the use of any mark on spark plugs), and that implicit in this right is Ford's right to use the Ghosted GT. The contention misses the point. Section VI refers only to the "Autolite assets," defined earlier in the order as the "Autolite" name and the battery and spark plug plants. To interpret Section VI, then, we must determine whether the Ghosted GT was made one of the "Autolite assets" by virtue of the "additions" language. Ford skips this step. Only upon a determination that the "additions" language does not refer to the "Autolite" name would Ford have a right to use the Ghosted GT under Section VI
 
 
 [12]
 Ford also attempts to buttress its position with Justice Department briefs, the prayer for relief, and various statements made by the Justice Department attorneys, all of which refer only to the "Autolite" name and trademark, and not to the Ghosted GT. This evidence is irrelevant, simply because the Ghosted GT would be considered a part of the "Autolite" name were we to construe the "additions" language in a manner consistent with Altran's reading of the order
 
 
 [13]
 Lending additional support to this interpretation is the general principle that a court order must be drafted with reasonable specificity. Fed.R.Civ.P. 65(d); Ideal Toy Corp. v. Plawner Toy Mfg. Corp., 685 F.2d at 83-84
 
 
 [14]
 Since we find that the 1970 divestiture order did not require Ford to divest the Ghosted GT, we need not, and do not, address Altran's contentions that Ford committed mail and wire fraud in concealing its retention and use of the Ghosted GT, and that this fraud was actionable under RICO
 
 
 [15]
 Under Rule 11, every paper of a party represented by an attorney must be individually signed by one attorney of record. This signature represents that:
 the signer has read the pleading, motion or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause any unnecessary delay or needless increase in the cost of litigation.
 Fed.R.Civ.P. 11.
 
 
 [16]
 In other words, the greater the level of creativity and originality, the less the level of independent effort that need be shown. Or conversely, where independent effort is great, a lower level of creativity will be accepted. Universal Athletic Sales Co. v. Salkeld, 511 F.2d at 908
 
 
 [17]
 Section 106 of the Copyright Act states in relevant part:
 Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and authorize any of the following:
 (1) to reproduce the copyrighted work in copies or phonorecords;
 (2) to prepare derivative works based upon the copyrighted work;
 (3) to distributed copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending....
 17 U.S.C. Sec. 106.
 
 
 [18]
 One exception to the application of the secondary meaning analysis, in the absence of federal registration and incontestability, is where the mark is considered inherently distinctive. United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 142 (3d Cir.1981). See 1 McCarthy, Trademarks and Unfair Competition at Secs. 15:1, 15:2. Distinctive marks include those which are arbitrary, fanciful, or suggestive. Arbitrary marks are "those words, symbols, pictures, etc., which are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." 1 McCarthy, Trademarks and Unfair Competition at Sec. 11:4. Fanciful marks "consist of 'coined' words which have been invented for the sole purpose of functioning as a trademark." Id. at Sec. 11:3. Marks such as "letters, numbers, product and container shapes, and designs and pictures may also be classed as 'fanciful.' " Id. Suggestive marks are virtually indistinguishable from arbitrary marks, id. at Sec. 11:4, but have been defined as marks which suggest a quality or ingredient of goods. Id. at Sec. 11:20. The secondary meaning analysis is used for marks which are merely "descriptive." A mark is considered descriptive if it describes "the intended purposed, function, or use of the goods; of the size of the goods, of the class of users of the goods, of a desirable characteristic of the goods, or of the end effect upon the user." Id. at Sec. 11:5. See A.J. Canfield Co. v. Honickman, 808 F.2d at 296-97. The characterization of a mark is a factual issue for the jury. See e.g. Sun-Fun Products, Inc. v. Suntan Research & Development, Inc., 656 F.2d 186 (5th Cir.1981); Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178 (5th Cir.1980)
 
 
 [19]
 Transgo has since changed the "Shift Kit" trade dress, retaining the "Shift Kit" name but replacing the image of the blurred car
 
 
 [20]
 Ford's Ghosted GT appears on Ford packaging in several different color schemes including blue, dark blue and white, and red, black and white
 
 
 [21]
 Located in the upper left hand corner of the "Shift Kit" trade dress is a block "Ford" enclosed in a rectangle. Ford argues that this use of the word "Ford" constitutes an independent basis for finding copyright and trademark infringement. Altran claims that the word is used merely to inform the consumer that the part purchased is designed for a Ford automobile. Because our resolution of this case relates solely to the use of the "Ghosted GT," we will not address this dispute
 
 
 [22]
 Although seemingly not argued on appeal, Altran raised a statute of limitations defense during the trial. Again, the jury verdict form makes it clear that the jury did not reach the issue, and thus, neither will we. It can be appropriately resolved during a new trial
 
 
 [23]
 We do acknowledge that Ford's evidence at trial in this regard was suspect. Ford failed to produce a witness who could testify from personal knowledge that Ford affixed its copyright to Ghosted GT packaging. Moreover, there is no physical evidence demonstrating that Ford affixes copyright notice to the Ghosted GT packaging
 
 
 [24]
 The omission rate is probably considerably lower, since the one hundred million figure was a conservative one, and since it is a yearly figure, while the number of omissions presumably accumulated over a period of years
 
 
 [25]
 We presume that the jury found the Ghosted GT to be descriptive, a finding we do not consider clearly erroneous. As we noted earlier, distinctive marks, unless federally registered and incontestable, are protected only upon a showing of secondary meaning. Had the jury determined that the Ghosted GT was inherently distinctive, secondary meaning would be presumed. Additionally, we note now, but save for further discussion later in the opinion, the fact that the Ghosted GT was not federally registered at the time this case was argued
 
 
 [26]
 Ford is in the process of obtaining a trademark registration for the Ghosted GT, if it has not already done so
 
 
 [27]
 "On the other hand, the issue of the defendant's intent may affect the amount of damages available to the plaintiff." Williams Electronics, Inc. v. Artic International, Inc., 685 F.2d at 878
 
 
 [28]
 Both of these cases addressed the issue of whether a publication occurred such that a common law copyright passed into the public domain. While not directly relevant to the issue before us, the definitions they provide of "publication" are persuasive
 
 
 [29]
 The testimony of industry insiders on likelihood of confusion should be given little weight, since, as was discussed in the Transgo analysis, the determination of likelihood of confusion must be made from the standpoint of a reasonably prudent buyer from the lowest stratum of the relevant buying class. In this case, that would be the ordinary car owner, and not an industry expert
 
 
 [30]
 If the jury during the new trial does find that only a few parts were packaged in Altran plastic bags, they could take that into account in calculating damages