**DENTSPLY INTERNATIONAL, INC., Plaintiff and Counterclaim Defendant,**

v.

**GREAT WHITE, INC., Defendant and Counterclaim Plaintiff.**

**Great White, Inc., Defendant and Third Party Plaintiff,**

v.

**Does 1 Through 5, Third–Party Defendants.**

**No. Civ.A. 1:CV–99–1346.**

United States District Court,
M.D. Pennsylvania.

Sept. 1, 2000.

Alan R. Boynton, Jr., Harvey Freedenberg, Debra P. Fourlas, McNees, Wallace & Nurick, Harrisburg, PA, Steven B. Lieberman, G. Franklin Rothwell, Celine Jimenez Crowson, Kenneth M. Fagin, Rothwell, Figg, Ernst & Kurz, Washington, DC, for Dentsply Intern., Inc.

William W. Warren Jr., Saul, Ewing, Remick & Saul LLP, Harrisburg, PA, Mark D. Miller, David G. Gilfillan, Dennis F. Gleason, John N. Bain, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, NJ, for Great White, Inc.

Bruce Fine, Wayne, NJ, pro se.

## MEMORANDUM

KANE, District Judge.

In this action, Plaintiff, Dentsply International, Inc. ("Dentsply"), asserts that Defendant, Great White, Inc. ("Great White"), infringed its patent for disposable dental syringe tips, U.S.Patent No. 5,342,-195 (hereinafter "'195 patent"), induced infringement of its patent for adaptors used to mount disposable syringe tips, U.S.Patent No. 5,236,356 (hereinafter "'356 patent"), and infringed its registered trademark, "SANI–TIP®," U.S.Reg. No. 2,246,056. Plaintiff also alleges false advertising, unfair competition, and, in an amended complaint, trade dress infringement by Defendant. Defendant has countersued for, *inter alia*, declaratory judgment of patent non-infringement, patent misuse and unenforceability, patent invalidity, and trademark non-infringement.

Now before the Court is Plaintiff's Motion for Preliminary Injunction. A hearing on the motion was held October 29, November 5, and November 12, 1999. The matter has been fully briefed and is ripe for disposition. Pursuant to Rules 52(a) and 65 of the Federal Rules of Civil Procedure, this memorandum constitutes the Court's findings of fact and conclusions of law with respect to Plaintiff's motion.

## I. Background

Dentsply, a company with its principal place of business in York, Pennsylvania, is, and has been for over 100 years, in the business of manufacturing, marketing, and selling a host of dental products on a worldwide basis. Among Dentsply's products are the SANI–TIP® system, which consists of disposable air/water syringe tips and adaptors for use by dentists.

In 1997 Dentsply acquired exclusive rights to the SANI–TIP® system, pursuant to an Asset Purchase and Sales Agreement between Dentsply and DW Industries, Inc. By that agreement and related licenses, Dentsply is the exclusive licensee under various patents covering the SANI–TIP® adaptors and syringe tips, including the '195 and '356 patents.

Dentsply is also the owner, user, and registrant of a federal trademark registration for SANI–TIP®, U.S. Registration No. 2,246,056 for "disposable tri-syringe tips," and, through a wholly owned subsid-

iary, the owner and user of U.S. Registration No. 1,919,512 for SANI–TIP® and the corresponding design for "disposable air/water syringe tips for dental syringes and adaptors for disposable air/water syringe tips."

Great White is a New Jersey corporation with its principal place of business in Wayne, New Jersey. Its two officers and controlling shareholders are Joseph Bukowski, a mechanical engineer, and Dr. Bruce Fine, a dentist. Great White manufactures, sells, and markets a disposable air/water syringe tip called "STERI–TIP."

In 1999, Dentsply learned that, since mid–1999, Great White has been advertising and selling disposable air/water syringe tips for dental use under the name "STERI–TIP." Great White's syringe tips are highly similar in appearance to SANI–TIP® tips, and Great White markets its product as interchangeable with SANI–TIP®.

Most dentists employ a hand-held instrument known as a "tri-syringe" to rinse and clear a patient's mouth in preparation for dental procedures. Through separate air and water tubes that terminate at the "handpiece body" of the tri-syringe, the device delivers streams of air, water, and combined air and water. The handpiece body of the tri-syringe has two operating buttons used to regulate the emission of air and water. When the dentist depresses the air button, air flows out of the tip of the tri-syringe and dries the targeted area of the patient's mouth. When the dentist depresses the water button, water is emitted from the tri-syringe tip to wash away debris. Depressing both buttons at once produces an air/water aerosol spray that is used to remove debris.

Since at least the 1970s, tri-syringes were commonly equipped with a metal syringe tip and a factory-installed adaptor, which connected the tip to the handpiece body. Metal tips were not disposable and required sterilization between uses on different patients.

In 1988, with the goal of providing a safe and sanitary alternative to metal syringe tips, Dr. David Wasserman and Warren Davis designed a disposable syringe tip system using a tip made of clear plastic through which fluids could be detected visually. Their system included the tips themselves, as well as special adaptors to enable use of these disposable tips with existing tri-syringes commonly used by dentists. This system became known as the SANI–TIP® system.

In August 1988, Davis and Wasserman founded DW to manufacture and market SANI–TIP® syringe tips and adaptors. They applied for patents in September 1988. Thereafter, from 1989 to 1996, Davis and Wasserman spent over $6.3 million advertising and promoting their invention. Dentsply acquired the rights to SANI–TIP® in 1997.

Since 1995, SANI–TIP® has been the leading disposable syringe tip in the United States. Over 150,000 SANI–TIP® adaptors have been distributed in the United States alone, while more than 300 million syringe tips have been sold.

## II. Jurisdiction and Venue

The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 1331, 1338(a)–(b), 2201, 2202 and 15 U.S.C. § 1121.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400.

## III. Preliminary Injunction Standard

"A preliminary injunction requires the assessment of four factors: [ (1) ] the likelihood of movant's success on the merits, [ (2) ] the irreparability of harm to the movant without an injunction, [ (3) ] the balance of hardships between the parties, and [ (4) ] the demands of the public interest." *Mentor Graphics Corp. v. Quickturn Design Sys.*, 150 F.3d 1374, 1377 (Fed.Cir. 1998). Of course, a preliminary injunction is "extraordinary relief," *see, e.g., New England Braiding Co. v. A.W. Chesterton*

*Co.,* 970 F.2d 878, 882 (Fed.Cir.1992), and even if there is a likelihood of success on the merits, a motion for preliminary injunction should be denied if equity so requires. *See, e.g., Eli Lilly & Co. v. American Cyanamid Co.,* 82 F.3d 1568, 1578 (Fed.Cir.1996); *Illinois Tool Works, Inc. v. Grip-Pak, Inc.,* 906 F.2d 679, 683 (Fed. Cir.1990). Indeed, a preliminary injunction cannot be granted without a showing of both a likelihood of success on the merits and irreparable harm. *See Reebok Int'l Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1555–56 (Fed.Cir.1994). Conversely, though, the Court need not necessarily find that the "balance of hardships" favors the plaintiff in order to grant the preliminary injunction. *See Hybritech Inc. v. Abbott Lab.,* 849 F.2d 1446, 1457 (Fed.Cir.1988).

Moreover, in the patent infringement context, a "likelihood of success on the merits" means a likelihood of success both with respect to patent validity and with respect to infringement. *See Reebok,* 32 F.3d at 1555–56. Further, "[a] strong showing of likelihood of success on the merits coupled with continuing infringement raises a presumption of irreparable harm to the patentee." *Id.* at 1556.

## IV. The '195 Patent

### A. *Likelihood of Success on the Merits*

As already stated, to obtain a preliminary injunction in a patent infringement action, the plaintiff must establish the reasonable likelihood of proving patent validity and infringement by the defendant. *See Reebok,* 32 F.3d at 1555–56. Grant of a preliminary injunction does not require proof "beyond all question." *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 390 (Fed.Cir.1987).

### 1. *Validity*

The patents are presumed to be valid under 35 U.S.C. § 282. Great White, which may overcome the presumption by a showing of clear and convincing evidence that the patents are invalid, has failed to meet that burden. First, Great White did not dispute the validity of the patents in its brief in opposition to Plaintiff's motion for preliminary injunction. Furthermore, at the hearing, though Great White sought to raise the issue, it adduced no convincing evidence of invalidity.

Moreover, in this case, where the products covered by the patents have enjoyed considerable, and undisputed, commercial success, and where competitors have avoided the patents, the presumption of patent validity is especially strong. *See Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1571 (Fed.Cir.1992) (where patented inventions enjoyed commercial success due to the technical merits of the product and patentee's competitor took license from patentee, such real world considerations provide "a solid evidentiary foundation on which to rest a non-obviousness determination"); *Akzo N.V. v. United States Int'l Trade Comm'n,* 808 F.2d 1471, 1481 (Fed. Cir.1986) (commercial success of patentee's product is a strong factor favoring nonobviousness), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). In addition, the mere fact that the parties disagree on the meaning of the patent claims does not render those claims invalid under 35 U.S.C. § 112. *See, e.g., North American Vaccine, Inc. v. Am. Cyanamid Co.,* 7 F.3d 1571, 1579 (Fed.Cir.1993), *cert. denied,* 511 U.S. 1069, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994). Because of Defendant's failure to counter the presumption of validity with clear and convincing evidence of invalidity, the '195 patent is presumed valid for the purposes of this motion.

### 2. *Infringement*

An infringement analysis requires two steps. The first step is to construe the meaning and scope of the patent claims. The second step is to determine whether the accused invention infringes the patent claims as construed. *See Markman v. Westview Instruments, Inc.,*

52 F.3d 967, 976 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The court construes disputed claim language as a matter of law. *See Markman*, 52 F.3d at 978. The court then determines whether the accused device is likely to fall within the scope of the claims. *See Sofamor*, 74 F.3d at 1220. To infringe, an accused device must embody each claim limitation or its equivalent. *See id.*

Under a literal infringement analysis, the accused device is held up against the construed claims to determine whether each limitation on the claims can be found in the accused device. *See Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 631 (Fed.Cir.1987). Under the doctrine of equivalents, a patent is infringed if the accused device performs substantially the same work in substantially the same manner and accomplishes substantially the same result. *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

While the Court must construe the meaning and scope of the patent claims in order to determine infringement, *Markman* does not obligate a court to interpret claims conclusively and finally during a preliminary injunction proceeding at an early stage in a case. *See id.* at 1221. "A trial court may exercise its discretion to interpret the claims at a time when the parties have presented a full picture of the claimed invention and prior art." *Id.* Furthermore, findings and conclusions as to claim construction at the preliminary injunction stage are not binding at trial. *See Illinois Tool Works, Inc. v. Grip–Pak, Inc.*, 906 F.2d 679, 681 (Fed.Cir.1990). In *International Communication Materials, Inc. v. Ricoh Co.*, 108 F.3d 316 (Fed.Cir. 1997), the Federal Circuit held that a district court did not abuse its discretion in denying a preliminary injunction based on a "tentative claim construction," given that there were "substantial open issues and questions that must be litigated before a finding of infringement can be made, including claim construction...." *Id.* at 318.

The parties in this case have not presented comprehensive arguments on the proper interpretation of either patent at issue in this case. Though a complete and final claim construction cannot be determined on an incomplete factual record, the probability of infringement must be examined. *See Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed.Cir. 1990) ("The district court need not make binding findings of fact, but at the very least, must find probabilities that the necessary facts can be proved."). Thus, the claim construction now set forth is tentative and substantial issues must be litigated before a conclusive finding of infringement or non-infringement may be made.

For purposes of this motion, Plaintiff relies solely on claim 1 of the '195 Patent, which discloses dental syringe tip assemblies having a disposable tip, an innovative adaptor, and a captivated thumb nut. The claims of the '195 Patent describe various characteristics of the disposable syringe tip.

The disputed portions of claim 1 are highlighted below.

1. A syringe tip comprising an elongated cylindrical rigid plastic member having a first central water passageway throughout the entire length of the cylindrical member, said first central water passageway being generally circular in cross-section, and a plurality of second air passageways disposed in a regular pattern circumferentially about the first central water passageway, said second air passageways extending substantially the entire length of the tip and ***the combined cross-sectional areas of the second air passageways being at least 30% of the total cross-sectional area that would result if the second air passageways were a single continuous annulus completely surrounding the central water passageway.***

In essence, the parties disagree on how the area of the annulus should be calculated, *i.e.,* how "at least 30% of the total cross-sectional area" is to be measured. Obviously, this dispute is material because if, by the applicable standard of measure, the cross-sectional areas of the second air passageways of Defendant's product are greater than 30% of the total cross-sectional annulus area, then the product falls within that portion of claim 1 of the '195 patent.

Plaintiff argues that the area of the annulus should be measured by the "best fit" method, which it contends is the industry standard. This method conforms the annulus closely to each of the second air passageways, resulting in a smaller annulus than the methodology embraced by Defendant. For its part, Defendant urges a method that defines the annulus by the outermost point of the outermost air passageway and the innermost point of the innermost air passageway. Defendant's methodology would maximize the area of the annulus and thus minimize the ratio of the areas of the air passageways to the total annulus area.

In order to construe the meaning and scope of a patent claim, the Court looks first to the claim language itself, the patent specification, and the patent's prosecution history file. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed.Cir.1996). Only if those "intrinsic" sources fail to provide adequate instruction as to how the annulus area is to be measured is resort to "extrinsic" evidence proper. Neither party contends that the intrinsic evidence resolves the annulus question. Rather, both Plaintiff and Defendant base their arguments upon extrinsic evidence, in this case the opinions of their respective expert witnesses. Before the Court may consider such extrinsic evidence, however, it first must look to the intrinsic evidence. Accordingly, the Court begins its analysis by considering the intrinsic evidence in this case.

The claim language itself, although invoking the term, does not define how an annulus or its area is to be calculated. Likewise, the specification sheds little light on the inquiry. It mentions the single continuous annulus, but does not indicate how to calculate it.

> In the preferred embodiments of the present invention, the combined cross-sectional areas of the air passageway opening should be at least approximately 30% of the total cross-sectional area that would result if the air passageway were a single continuous annulus completely surrounding the central water passageway. This lower limit on percentage of the opening is to minimize the amount of the aerosol.

'195 Specification, col. 9, ln. 7–14. Plaintiff argues that its proposed measurement methodology is, at least, consistent with the specification's general emphasis on the importance of size, rather than the precise location, of the second air passageways. *See id.* at col. 8, ln. 64 to col. 9, ln. 6. According to the specification, it is the size of the openings—not their exact position— that impacts upon air pressure and the exiting aerosol. In this way, the specification generally supports Plaintiff's methodology which likewise stresses the importance of the size of the air passageways over their location. While the foregoing is true, this alone does not, by any means, unambiguously indicate how the annulus area is to be measured.

All that remains of the intrinsic evidence to be considered is the prosecution history of the '195 patent. For reasons not stated, neither party has seen fit to provide the '195 prosecution history to the Court. Consequently, from the parties' agreement that the intrinsic evidence does not answer the annulus inquiry, the Court must conclude that indeed the prosecution history of the '195 patent offers no guidance on this question.

In those cases in which the intrinsic documents do not resolve the matter of claim construction, extrinsic evidence may

be utilized, but "only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language." *Vitronics,* 90 F.3d at 1584. Extrinsic evidence such as prior art, dictionaries, and expert testimony may assist the Court in coming to a proper understanding of the claims.

This is, then, one of those rare cases in which resort to extrinsic evidence is warranted. The Federal Circuit has articulated the following hierarchy for extrinsic evidence.

> [A] court in its discretion may admit and rely on prior art proffered by one of the parties, whether or not cited in the specification or the file history. This prior art can often help to demonstrate how a disputed term is used by those skilled in the art. Such art may make it unnecessary to rely on expert testimony and may save much trial time. As compared to expert testimony, which often only indicates what a particular expert believes a term means, prior art references may also be more indicative of what all those skilled in the art generally believe a certain term means.

*Id.* Defendant's Exhibit 77 provides definitions of "annulus" and "annular section" according to the McGraw–Hill Dictionary of Scientific and Technical Terms (1974). It defines annulus as "the ringlike figure that lies between two concentric circles" and "annular section" as "the open space between two concentric tubes, pipes, or vessels." Neither definition, however, addresses the critical issues of how and where the concentric circles are to be drawn when an annulus is imposed around fixed points.

With respect to the '195 patent, the only other proffered extrinsic evidence consists exclusively of the testimony of Plaintiff's expert, John F. Lueckenbach, and of Defendant's expert, Mihai A. Vinatoru. Accordingly, the Court now turns its attention to these experts' opinions.

Lueckenbach testified that when Plaintiff retained his services for use in this matter, he was provided with five STERI–TIPS and asked to determine the total cross-sectional area of the secondary air passageways and the ratio of that area to the total cross-sectional area of a continuous annulus. Significantly, however, Lueckenbach testified that he was not informed by Dentsply what result, *i.e.,* a ratio greater or less than 30%, would be more helpful to Dentsply. Nor was he instructed how the annulus should be drawn or measured. As a consequence, Lueckenbach, who has nearly 40 years of professional experience performing highly precise measurements of this sort, was free to use his best professional judgment to calculate the annulus area according to accepted industry standards.

In stark contrast, Vinatoru testified in deposition, and did not deny at the hearing, that at their first meeting Bukowski instructed him to use a specific method to calculate the annulus area, and that that method was set out in Def.'s Exs. 185 and 188. *See also* Pl.'s Ex. 56. In this way, Bukowski dictated the measurement methodology that Vinatoru would use and was able to cloak that method with the imprimatur of "expert" simply by retaining Vinatoru. As a result, Vinatoru's position is suspect.

There is further cause to credit Plaintiff's methodology and reject that proffered by Defendant. Lueckenbach's method places the patented invention, as embodied in the SANI–TIP® tip, squarely within the scope of claim 1. That is, the combined cross-sectional areas of the secondary air passageways of the SANI–TIP® are approximately 30% or more of the total cross-sectional annulus area when measured by Lueckenbach's "best fit" technique. But, when Bukowski's method of measurement is utilized, Dentsply's own product—which was designed specifically to fall within the scope of the patent—does not come within the terms of claim 1. Bukowski's technique applied to the SANI–TIP® tip yields an annulus

area ratio of well under 30%. In fact, by Bukowski's method, the annulus area ratio for the SANI–TIP® varies widely, ranging anywhere from 16.04% up to 24.39%. Such wide ranging results, when the same tips are tested by the same method, reflects a troubling inconsistency inherent in Bukowski's method. For all these reasons, the Court rejects the annulus area measurement methodology advanced by Defendant.[1]

Instead, the Court is of the view that the methodology utilized by Lueckenbach represents the industry standard and, at the same time, is in full accord with the language of the patent itself. Thus, for present purposes the Court finds that the "continuous annulus," as that term is used in claim 1, is measured or calculated using the "best fit" method, as it has been described by Lueckenbach.

■ Having so found, the Court now reaches the second step of the infringement analysis, comparison of the STERI–TIP tip to the claim as preliminarily construed by the Court. It is undisputed that the cross-sectional area percentage for Defendant's product, when measured using the best fit standard, is well above the 30% threshold set by claim 1. Lueckenbach testified credibly that his results on five different STERI–TIP tips yielded the following percentage ratios: 34.6%, 35.0%, 34.4%, 35.5%, and 36.0%. Defendant does not dispute that these figures are the result of a correct application of the best fit method. Because Defendant's STERI–TIP tips read on claim 1 in this critical

respect and admittedly meet the claims of the '195 patent in all other respects, there is only one reasonable conclusion: Defendant has infringed Plaintiff's '195 patent. Therefore, the Court finds that Plaintiff has established a likelihood of success on the merits of its claim for infringement of the '195 patent.

Moreover, by any measure, even that advanced by Defendant, several of the STERI–TIP lots and at least 10,500 STERI–TIP tips had area percentage ratios above 30% and thus infringed, a point Defendant is forced to concede. *See* Def.'s Br. at 7. Making, using, offering to sell, and selling any patented invention is prohibited by the patent laws. *See* 35 U.S.C. § 271(a). Further, the Federal Circuit has said

> It is beyond argument that performance of only one of the ... enumerated activities is patent infringement. It is well-established, in particular, that the use of a patented invention, without either manufacture or sale, is actionable.

*Roche Prods., Inc. v. Bolar Pharm. Co.,* 733 F.2d 858, 861 (Fed.Cir.1984) (superseded on other grounds by 35 U.S.C. § 271(e)). Defendant does not dispute that it made infringing tips. Moreover, "use" of a patented invention is defined broadly. *See Roche* at 861 ("Section 271(a) prohibits, on its face, any and all uses of a patented invention."), Bukowski admits that Great White used the tips known to be infringing as prototype samples that it provided to potential distributors.[2] *See*

---

**1.** Even if the Court were persuaded that Defendant's measurement method is correct, the STERI–TIP tip would infringe the '195 patent under the doctrine of equivalents, wherein the "essential inquiry [is whether] ... the accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention." *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Defendant's own measurements done on STERI–TIP samples it selected from the same lot tested by Lueckenbach yielded area percentage ratios ranging from 21.01% to 26.90%. Having considered the patented

invention and the accused product in manifold perspective, the Court finds that the role played by the secondary air passageways—the critical element here—in Defendant's product is virtually indistinguishable from that of the secondary air passageways in the SANI–TIP® tip. *Cf. Hilton Davis Chemical Co. v. Warner–Jenkinson Co.,* 114 F.3d 1161, 1164 (Fed.Cir. 1997). Thus, the '195 patent is infringed under the doctrine of equivalents when Defendant's measurement method is used.

**2.** Defendant does not argue, for good reason, that the admittedly infringing tips fall within the "experimental use" or de minimis excep-

Bukowski Decl. ¶ 11. This admitted infringement provides an independent basis for finding likelihood of success on the merits. *Cf. Thorn EMI North America, Inc. v. Micron Technology, Inc.* 821 F.Supp. 272, 275 (D.Del.1993) ("Each delivery of a free sample of a[n] allegedly infringing product is a potential sale lost to the patentee.... [S]uch delivery must be regarded as 'use' of an allegedly infringing product for the purposes of § 271(a).").

### B. *Irreparable Harm*

■ As previously noted, "[a] strong showing of likelihood of success on the merits coupled with continuing infringement raises a presumption of irreparable harm to the patentee." *Reebok,* 32 F.3d at 1556. When triggered, the presumption shifts the ultimate burden of production on the question of irreparable harm to the alleged infringer. *See id.*

Continuing infringement is affirmatively established here by Defendant's own conduct. From the commencement of this action until the present time, Defendant has continued to manufacture and market its STERI–TIP product. The Court finds that this on-going infringing conduct by Defendant and the strong showing by Plaintiff on the merits of this claim are sufficient to trigger the presumption of irreparable harm and shift the burden on that issue to Defendant.

Defendant, for its part, has adduced no evidence that Plaintiff's damages will be fully compensable with money damages. This is not a case in which the alleged infringer has ceased production of the accused product, thereby justifying a finding that the presumption has been overcome. *See, e.g., Reebok,* 32 F.3d at 1558. Rather, here the alleged infringer has unabashedly continued to manufacture and market the accused device.

Further, the Federal Circuit has stated, "Harm to reputation resulting from confusion between an inferior accused product and a patentee's superior product is a type of harm that is often not fully compensable by money because the damages caused are speculative and difficult to measure." *Reebok,* 32 F.3d at 1558. On hearing, there was conflicting evidence as to whether or not the STERI–TIP product was inferior to the SANI–TIP product. Defendant's evidence and demonstrations on this question did not convince the Court that, indeed, Great White's product performs just as well as Dentsply's product. Thus Defendant has failed to show that Plaintiff's only damages will be those that are fully compensable with money damages. Consequently, Defendant has not overcome the presumption of irreparable harm to which Plaintiff is entitled based on its strong showing of likelihood of success on the merits and Defendant's continuing infringement.

Beyond harm to reputation is the harm intended to be protected by the patent laws. The patent statute provides for injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money. *See Hybritech,* 849 F.2d at 1457. Because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole. *Id.* In view of these harms and because Defendant has failed to overcome the presumption of irreparable harm, the Court finds sufficient irreparable harm to warrant preliminary injunctive relief.

### C. *Balance of Harms*

■ The penultimate factor to be considered in deciding whether to issue a

---

tions to § 271(a). Because Great White concedes that the use of the tips as prototype samples was for commercial purposes, *i.e.,* generating future sales, it cannot reasonably

contend that either of those "very narrow[ ]" exceptions apply. *Embrex, Inc. v. Service Engineering Corp.,* 55 U.S.P.Q.2d 1161, *5, 216 F.3d 1343 (Fed.Cir.2000).

preliminary injunction is the balance of harms. In weighing the hardships, the Court balances the harm that will occur to the moving party from denial of the preliminary injunction against the harm that the non-moving party will incur if the injunction is granted. *See Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1457 (Fed.Cir.1988).

Having just addressed the nature of the harms to Plaintiff, the Court now turns to the harm to Defendant should the injunction issue. There can be no question that if Defendant is barred from continuing its infringing conduct, it will lose sales, and ultimately, money. Indeed, if Defendant fails to create an innovative product of its own, it may be put out of business altogether by the injunctive relief Plaintiff seeks. But, as in *Smith Int'l Inc. v. Hughes Tool Co.,* 718 F.2d 1573 (Fed.Cir. 1983), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983), Defendant here "knew of the [Plaintiff's] patents when it designed the [STERI–TIP] and took a calculated risk that it might infringe those patents." *Id.* at 1581.

Thus, as was the case in *Hybritech,* neither party has a clear advantage with respect to this factor. *See Hybritech,* 849 F.2d at 1457–58. Here, there are very serious consequences to Plaintiff if there is no injunction and similarly serious consequences to Defendant if there is a preliminary injunction. On this basis, the Court concludes that this third factor weighs neither in favor nor against issuance of injunctive relief. This conclusion is no bar to the relief Plaintiff seeks. *See id.* at 1457 ("we never have required, as a prerequisite to awarding preliminary injunctive relief, that the district court expressly find the existence of this [third] factor.").

### D. *Public Interest*

The fourth and final factor that must be considered in determining whether to issue a preliminary injunction is the impact an injunction would have on the public interest. Typically, in a case of patent infringement, although there exists a public interest in protecting rights secured by valid patents, *see Smith Int'l,* 718 F.2d at 1581, the Court's public interest analysis "should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech Inc.,* 849 F.2d at 1458; *see also Datascope Corp. v. Kontron Inc.,* 786 F.2d 398, 401 (Fed.Cir.1986).

In the case at bar, it cannot be said that the public interest would in any way be harmed by enjoining the manufacture and sale of Defendant's STERI–TIP products. It is not as though Defendant is providing consumers of dental syringe tips with a novel product or that an injunction would deprive the public of some innovation. To the contrary, Defendant's product is, and is marketed by Defendant as being, in all material respects the same as the leading product in the market, a product that will remain on the market notwithstanding issuance of an injunction against Defendant. The Court finds, therefore, that the public interest in enforcing valid patents outweighs any other public interest considerations.

Having weighed each of the four relevant factors against the others, the Court finds that injunctive relief is warranted here. "Equity requires that no one element be dispositive, that each be weighed and measured against others and against the relief demanded." *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1269 n. 2 (Fed.Cir.1985). Accordingly, Defendant will be enjoined from continuing to infringe upon the '195 patent.

### V. The '356 Patent

Plaintiff further alleges that Defendant "has been selling and actively promoting the use of its STERI–TIP syringe tips in combination with DENTSPLY'S SANI–TIP® ... adaptors, thereby contributorily infringing the '356 patent under 35 U.S.C. § 271(c), and actively inducing infringe-

ment of the '356 patent under 35 U.S.C. § 271(b)." Compl. ¶ 28.

Like the '195 patent, the '356 patent discloses dental syringe tip assemblies having a disposable tip, an innovative adaptor, and a captivated thumb nut. The claims of the '356 patent are focused principally upon the characteristics of the adaptor, as used in combination with a syringe tip and handpiece body.

Only one claim of the '356 patent, claim 6, is disputed. It is set out below.

6. A dental syringe assembly comprising a handpiece body including means for mounting a syringe tip assembly to the handpiece body, said syringe tip assembly comprising

   a) a syringe tip adaptor for connecting a syringe tip to a handpiece body comprising

   1) a generally cylindrical body having a hollow interior,

   2) first screw threads on the exterior surface of the cylindrical body for connecting the cylindrical body to the handpiece body,

   3) a channel means for providing an air passageway from the handpiece body through the cylindrical body and into an air passageway in the syringe tip, the channel means being disposed relative to the hollow interior of the cylindrical body,

   4) a baffle mounted within the hollow interior of the cylindrical body, the baffle including an axial opening, and

   5) an elongated tapered male connector formed integrally with the baffle and having an axial opening therethrough adapted to cooperate with a central passageway in a syringe tip to provide a water passageway from the handpiece through the adaptor and into the syringe tip whereby *when a syringe tip is mounted on the tapered male connector, the syringe tip will be tightly held on the tapered male connector to prevent axial rotation of the syringe tip* and to ensure that the air and water passageways do not leak into each other and

   b) a syringe tip mounted on the syringe tip adaptor.

Count II of Plaintiff's complaint contends that the use of Defendant's STERI–TIP tip, in connection with Plaintiff's adaptor, induces or contributes to infringement of the '356 patent. The complaint does not allege that Defendant's adaptor itself directly infringes on any patent held by Plaintiff. Because Plaintiff's charges of contributory infringement and inducing infringement presuppose a combination of which the STERI–TIP tip is a part, such infringement can occur only when the STERI–TIP tip is available for use. Because any and all use of the STERI–TIP tip will be enjoined for other reasons set out above, the question of whether the '356 patent is infringed by some combination of which the STERI–TIP is a part becomes moot. For that reason, the Court need not decide at this time whether Defendant's use of its STERI–TIP tip in conjunction with the SANI–TIP adaptor contributorily infringes or induces infringement of the '356 patent.

## VI. Trademark Infringement

### A. *Likelihood of Success on the Merits*

Trademark infringement is established when a plaintiff proves that (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff, and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services. *See Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 291 (3d Cir. 1991); Lanham Trade–Mark Act, § 43(a), 15 U.S.C. § 1125(a).

Where, as here, a mark has not

achieved incontestability,[3] validity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive. *See Ford Motor Co.,* 930 F.2d at 291.

■ Plaintiff argues that its SANI-TIP® mark is inherently distinctive. The Third Circuit has said that distinctive marks are those which are arbitrary, fanciful, or suggestive.[4] Defendant counters that SANI-TIP® is merely descriptive and thus not inherently distinctive. Whether Plaintiff or Defendant is correct in its characterization of the SANI-TIP® mark—a factual issue ultimately to be decided by the jury, *see Ford Motor Co.,* 930 F.2d at 292 n. 18—need not be decided at this preliminary stage, however, because there is record evidence of secondary meaning, the existence of which negates the need for a showing of inherent distinction.

Secondary meaning is demonstrated where

in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself. Although there are numerous cases determining secondary meaning, there is no consensus on its elements. A non-exclusive list of factors which may be considered includes the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the

company, the number of sales, the number of customers, and actual confusion. *Id.* at 292 (internal citations and quotation marks omitted).

Here, the evidence of secondary meaning is that since April 1989 Dentsply or DW have made extensive and continuous use of the SANI-TIP® mark to identify the source of disposable dental syringe tips; Dentsply and DW have spent millions of dollars to advertise and promote the product under the SANI-TIP® mark, Dentsply's promotional efforts led to a significant volume of sales and considerable goodwill in the SANI-TIP® brand name, and Dentsply is the leading seller of disposable dental syringe tips in the United States. *See* hearing transcript; Harlacher Decl., ¶¶ 5–10; Davis–Wasserman Decl., ¶¶ 6–14. For preliminary injunction purposes, this showing, by means of hearing testimony and sworn declarations, is sufficient to establish secondary meaning and thus the validity of the SANI-TIP® mark.

Federal registration of a mark, which is *prima facie* evidence of the mark's validity, is also *prima facie* evidence of the registrant's ownership of the mark and of the registrant's exclusive right to use the mark in commerce, subject to any common law or equitable defenses which otherwise could be asserted if the mark were unregistered. *See* 15 U.S.C. § 1115(a). Defendant has not submitted any evidence suggesting that Dentsply does not own the SANI-TIP® mark. Therefore, for instant purposes, the second element of Plaintiff's

---

**3.** A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration. *See* 15 U.S.C. §§ 1058, 1065.

**4.** The Third Circuit defined those terms in *Ford Motor Co.,* writing

Arbitrary marks are "those words, symbols, pictures, etc., which are in common linguistic use but which, when used with the goods or services in issue, neither suggest

nor describe any ingredient, quality or characteristic of those goods or services." Fanciful marks "consist of 'coined' words which have been invented for the sole purpose of functioning as a trademark." Marks such as "letters, numbers, product and container shapes, and designs and pictures may also be classed as 'fanciful.'" Suggestive marks are virtually indistinguishable from arbitrary marks, but have been defined as marks which suggest a quality or ingredient of goods.

*Ford Motor Co.,* 930 F.2d at 292 n. 18 (internal citations omitted).

trademark infringement case is established.

■■ All that remains for Plaintiff to establish trademark infringement is a determination of whether there is a likelihood of confusion between "SANI–TIP®" and "STERI–TIP." The showing of proof a plaintiff must make to satisfy this requirement depends on whether the goods or services offered by the trademark owner and the alleged infringer are in direct competition. Where, as here, the trademark owner and the alleged infringer deal in competing goods, "the court need rarely look beyond the mark itself," *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir.1994), and should focus on the marks to determine whether they are "confusingly similar." *Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1063 (3d Cir.1991). Similarity of two marks may be judged by their appearance, pronunciation, and meaning, as well as the overall impression created by the marks. *See Apple Corps. Ltd. v. Button Master*, 47 U.S.P.Q.2d 1236, 1241 (E.D.Pa.1998).

Defendant does not dispute, nor could it, that the terms SANI–TIP® and STERI–TIP are identical in literal meaning and strikingly similar in appearance and sound (or pronunciation). Obviously, the suffix of each, "tip," is identical. The first words within each product name—sani and steri—are synonymous.[5] Moreover, both sani and steri are two-syllable words that begin with the letter "s" and end in the letter "i." Only the few middle letters are different. Still, the marks must be compared in their entirety. *See Country Floors*, 930 F.2d. at 1065.

Viewing the marks holistically, the Court finds that the overall commercial impression created by "SANI–TIP®" and "STERI–TIP" is fundamentally identical, leading to a likelihood of confusion as to the origin of the products.[6] The Third Circuit has held that "if the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.'" *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 195 (3d Cir.1990). For the foregoing reasons, Dentsply has demonstrated a strong likelihood of success on the merits of its trademark case.

### B. *Irreparable Harm*

The Third Circuit has said "trademark infringement amounts to irreparable harm as a matter of law." *S & R Corp. v. Jiffy Lube International, Inc.*, 968 F.2d 371, 378 (3d Cir.1992). Therefore, having already concluded that Plaintiff is likely to prove at trial that Defendant is infringing its trademark, the Court further concludes that Plaintiff has *a fortiori* demonstrated irreparable harm.

### C. *Balance of Hardships*

Plaintiff must also show that its benefits from a preliminary injunction are not outweighed by irreparable injury to Defendant. Although Great White's position as a small, start-up company attempting to break into the dental supply industry is, in some respects, sympathetic, Great White has brought the difficulties of which it complains upon itself. Defendant could have harnessed, but did not, the fertile imaginations of its principals to come up with its own unique name for its disposable syringe tips. Instead, Great White chose

---

5. "Sani" is the root of "sanitary," which derives from the Latin "sanitas" and means hygienic or free from elements, such as filth or bacteria, that endanger health. *See* The American Heritage Dictionary 1090 (2d ed.1985). Likewise, "Steri" is the root of "sterile," which means free from bacteria or other microorganisms. It is from the Latin "sterilis," meaning "unfruitful." *See* The American Heritage Dictionary 1195 (2d ed.1985).

6. Indeed, evidence adduced at the hearing shows that even Great White personnel had been confused by the highly similar names, using the word "Sani–Tips" in written communications to customers when the word "Steri–Tips" was intended.

to closely mimic, with only slight variation, the registered name of the leading disposable syringe tip product on the market. Clearly, Great White is harmed by the inability to market its syringe tips under the name "STERI–TIP," but that self-inflicted harm is far outweighed by the immeasurable damage done to Dentsply by the infringement of its trademark.

### D. *Public Interest*

Finally, Plaintiff must show that a preliminary injunction on these facts serves the public interest. In a trademark case, the public interest is "most often a synonym for the right of the public not to be deceived or confused." *Opticians,* 920 F.2d at 197 (collecting citations). Where a likelihood of confusion arises out of the concurrent use of an infringing mark, the infringer's use damages the public interest by spawning confusion in the market. *See id.* at 197–98; *S & R Corp.,* 968 F.2d at 379. The Court finds, therefore, that injunctive relief would be in the public's interest.

### VII. False Advertising

■ To establish a Lanham Act claim based on a false or misleading representation of a product the plaintiff must show:

1) that the defendant has made false or misleading statements as to his own product or another's;

2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience;

3) that the deception is material in that it is likely to influence purchasing decisions;

4) that the advertised goods traveled in interstate commerce; and

5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*See Warner–Lambert Co. v. Breathasure, Inc.,* 204 F.3d 87, 91–92 (3d Cir.2000); 15 U.S.C. § 1125(a)(1)(B).

Plaintiff contends that two statements made by Defendant in its promotional materials are false. First, Plaintiff challenges Defendant's claim that "The STERI–TIP adaptor and single use air/water syringe tip can be used with other leading disposable tips and adaptors." *See, e.g.,* Exs. D, G to Harlacher Decl. Next, Plaintiff disputes Defendant's claim that "STERI–TIP®'s (sic) transparent disposable air/water syringe tip and variable mist adapter allow *constant* monitoring of air supply for water contamination which is not available in any other air/water syringe tip system." *See* Pl.'s Ex. 74, 76.

The claim relating to the interchangeability of the STERI–TIP system with other leading tips and adaptors is technically false because there is one and only one adaptor, the SANI–TIP® adaptor, with which STERI–TIP is compatible. Defendant concedes that "SANI–TIP® is currently the only leading disposable tip and adapter in the industry." Def.'s Memorandum in Opposition to the Entry of a Preliminary Injunction, at 26; *see* Fine Decl., at ¶ 3. Still, Defendant argues that its tips "fit" on Adec adaptors, another type of adaptor, but never contends that STERI–TIP tips could actually function with an Adec adaptor. Testifying at the hearing, Dr. Fine was careful to say only that Great White's tips would "fit into" Adec adaptors, not that they could actually be used effectively with any Adec product. *See* Tr. at 377, 416, 421.

The evidence thus far demonstrates, therefore, that the assertion that STERI–TIP is compatible with other tips and adaptors is literally false. When a claim is literally false, "a court may grant relief without considering [the second element of a false advertising claim,] whether the buying public was misled." *Johnson & Johnson–Merck v. Rhone–Poulenc Rorer Pharmaceuticals,* 19 F.3d 125 (3d Cir. 1994). Therefore, this Court proceeds directly to the third requisite element, that

the deception is material in that it is likely to influence purchasing decisions.

There is insufficient evidence from which the Court may conclude that this false statement of compatibility with multiple tips and adaptors would influence a purchaser of disposable syringe tips. It is especially difficult to conceive of any situation in which a purchaser would be influenced by the statements actually made in a way that differs materially from the true statement that STERI–TIP is compatible with a single tip and adaptor. For this reason, the Court finds that Plaintiff has not established a successful false advertising claim vis-a-vis the interchangeability of the STERI–TIP.

The result is different, however, with respect to the claim that the STERI–TIP system is the only system to allow constant monitoring of the air supply for water contamination. This is literally false and Defendant has conceded as much. *See* Def.'s Post Hearing Br. at 11. Accordingly, Defendant "withdrew the specific language complained of weeks ago." *Id.* Even though Defendant has withdrawn that language, there is nothing to prevent it from subsequently reviving that false claim. Therefore, the Court will continue the preliminary injunction analysis with regard to the false advertising claim.

Again, because the claim is literally false, the next inquiry is whether the deception is material in that it is likely to influence purchasing decisions. By claiming that only Great White's product offers the ability to constantly monitor the air supply, Defendant necessarily implies that Plaintiff's directly competing product does not boast that feature. In the market for virtually any product, one who offers a useful feature that its competitor does not is at a plain competitive disadvantage over that competitor. Therefore, it is reasonable to conclude that this false statement would influence purchasing decisions.

The fourth element, travel in interstate commerce, is not disputed here, so the Court turns to the fifth and last element of a claim for false advertising under § 43(a) of the Lanham Act. The likelihood of injury to the Plaintiff is manifest from the foregoing discussion of the materiality of the false statement and its likelihood to influence purchasing decision. All other things being equal, rational purchasers of disposable syringe tips should prefer a tip that allows constant monitoring of the air supply to one that does not. Thus, the false statement is likely to result in lost sales of Plaintiff's SANI–TIP® tip. Accordingly, Plaintiff has successfully demonstrated that it is likely to prevail on one of its false advertising claims.

The second preliminary injunction threshold requires Plaintiff to establish that it will be irreparably harmed by the false claims if it does not receive preliminary relief, and that money damages and/or an injunction ordered at final judgment would not rectify that harm. This element is established when Plaintiff demonstrates a likelihood of consumer deception with resulting probable impact on Plaintiff.[7] *See* 4 J. Thomas McCarthy,

---

7. "(A) showing of a likelihood of confusion of consumers will usually result in proving the requisite likelihood of damage to the plaintiff-competitor. Thus, the prime test of liability under § 43(a) is closely analogous to, if not identical with, the likelihood-of-confusion test of federal and common-law trademark infringement and unfair competition.

Since § 43(a) was passed as a consumer protection statute, the courts are not reluctant to allow a commercial plaintiff to obtain an injunction even where the likelihood of pecuniary injury to the plaintiff may be slight. Thus, under § 43(a), Congressional policy appears to encourage commercial companies to act as the fabled "vicarious avenger" of consumer rights. An injunction, as opposed to money damages, is no windfall to the commercial plaintiff. An injunction protects both consumers and the commercial plaintiff from continuing acts of false advertising. The fact that § 43(a) was passed to protect consumers as well as competitors is illustrated by the rule that a likelihood of consumer confusion is sufficient for injunctive relief. An injunction protects the consumer from continued false advertising. Money damages, on the other hand, primarily aid only the competitor,

Trademarks and Unfair Competition, § 27:37 (4th ed.1997); *see also Upjohn Co. v. Riahom Corp.,* 641 F.Supp. 1209, 1224 (D.Del.1986); *Ames Publishing Co. v. Walker–Davis Publications, Inc.,* 372 F.Supp. 1, 13 (E.D.Pa.1974). Having already found that each element of a false advertising claim has been established, the Court readily finds irreparable harm to Plaintiff as a result of likely consumer deception if the false advertising is permitted to continue.

With regard to the third requisite to injunctive relief, barring a party from making false claims imposes no undue hardship. Although Defendant may suffer decreased sales if it is precluded from false advertising, that hardship will not be undue. Therefore, the balance of hardships favor injunctive relief.

The fourth and final threshold for injunctive relief, the public interest, also weighs in favor of relief. The public interest in truthful advertising is obviously served by a court's prohibition of advertising that is plainly false. *See, e.g., Sanborn Manufacturing Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 490 (8th Cir.1993) (noting that "the public interest favors enjoining false statements").

## VIII. Conclusion

For the foregoing reasons, Plaintiff's motion for preliminary injunction will be granted in all respects. Fed.R.Civ.P. 65(c) requires payment of security by an applicant for injunctive relief in an amount the Court deems proper for the payment of costs and damages incurred by any party found to have been wrongfully enjoined. There is insufficient evidence before the Court to permit a full assessment of the possible costs and damages Defendant would incur if found to have been wrongly enjoined. Therefore, subject to a motion by either party to increase or decrease the amount of security and a hearing on the

matter, Plaintiffs will be required to post a bond or other security in the amount of $ 25,000 with the Clerk of Court.

An order will issue.

and he is required to satisfy a higher standard of proof as to injury." J. McCarthy, Trademarks & Unfair Competition, § 27:5A at 250–51 (1973) (footnotes omitted).